Shandrinaye S. WILLIAMS, Plaintiff,

v.

RUSSELL CORPORATION, Defendant.

No. Civ.A. 01–T–1274–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 8, 2002.

Arlene M. Richardson, T. Allen French, Richardson & French, Hayneville, AL, for plaintiff.

Thomas A. Davis, David Turner Wiley, Constangy, Brooks & Smith, Birmingham, AL, Tom Cortney, Montgomery, AL, for defendant.

## OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Shandrinaye S. Williams, an African–American woman, brings this lawsuit against defendant Russell Corporation, seeking damages and equitable relief for employment discrimination on the basis of gender discrimination, sexual-harassment-hostile-environment, and retaliation claims arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 20000e through 2000e–17. Williams alleges that Russell Corporation failed to investigate her complaint of sexual harassment properly and then retaliated against her for her complaint, in the form of excessive discipline, an unfavorable transfer, and constructive discharge. This court has jurisdiction over the claims in this lawsuit on the base of 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and 42 U.S.C. § 2000e–5(f)(3). The matter is now before the court on the defendant's summary-judgment motion. For the reasons that follow, the motion will be granted.

## I. SUMMARY–JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively

set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of the pleadings. Fed.R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II.  FACTUAL BACKGROUND

The facts, taken in the light most favorable to Williams, are as follows. Russell Corporation is an international manufacturer and marketer of clothing, with a distribution center located in Montgomery, Alabama. In March 1997, Williams began working for the company in the packing department at its Montgomery distribution center. She subsequently bid on and transferred to the job of lift operator. The lift-operator job involves pulling boxes from a shelf to place them in line for shipment or stacking boxes for storage. The average for lift operators is one box per minute. At the distribution center, lift operators carry a hand-held scanner to scan each box into the center's computerized inventory system. This system is monitored by employees known as expediters. The computerized system tracks the work flow of the lift operators and the location of each box. A lift operator's assignment at a particular time and corresponding work area are determined by the labels or pull sheets distributed by the supervisor or lead person.

### A.  Alleged-Sexual Harassment

In October 1999, while at work one morning, Williams went to the women's restroom between 9:40 and 10:00 a.m. While she was in a stall, someone opened the door and came in. Williams looked under the stall door and saw a person wearing stone-washed jeans and white leather Reebok shoes. She recognized the clothing as that of whom she believed to be male co-worker Arnez Purter.

The person was walking slowly toward the stall where Williams was. Williams became frightened, so she coughed to alert the person to her presence. After she coughed, the person turned around and left the restroom. As he left, she could see through the crack of the stall door that he wore a light yellow shirt. She never saw the face of the person. Nor was she ever exposed to the person.

While Williams was still in the restroom, a female co-worker (Kassy Mean) came in, and Williams asked her if she had seen anyone come in or out of the women's restroom. The co-worker said she had not, but that she had seen a man using the drinking fountain right next to the restrooms. The man's clothing, as described by the co-worker, matched the clothing Williams had seen on the person entering the restroom.

Williams then exited the restroom and spoke to another co-worker (Edward Talley), who had been working near the area where both the men's and women's restrooms were located. Williams told this co-worker what had happened, and he said that he had seen Purter go into the area where the restrooms were located. The co-worker suggested that she report the incident to her supervisor.

On her way to see the shift supervisor, Williams saw Purter, the male co-worker whose clothing she had recognized. She confronted Purter, asking him why he had come into the women's restroom. He first said, "I did not come in the restroom on you." When she said, "Yes you did," and described his actions, he admitted to her, "I walked in but I walked out." Williams told Purter she was going to report the incident to the supervisor. Purter then denied having entered the restroom at all.

Williams immediately reported to her shift supervisor (Chris Bishop) that another employee had entered the women's restroom while she was using it. Williams told the supervisor that she had seen Purter in the area and that, based on a comparison of Purter's clothing to that of the person she saw in the restroom as well as a co-worker's statement that Purter had been seen in the area, she believed Purter was the person who had entered the restroom when she was using it. The supervisor asked Williams to write a statement describing the incident, which she did. Williams's written statement did not include the name of Edward Talley.

The supervisor also directed Williams to report the situation to the human resources manager (Alan Williams). That same day, the human resources manager met with Williams, who provided him with her written account of the incident. The manager asked Williams several questions about the incident, as well as whether she had had any prior problems with Purter, and whether there was anyone else in the restroom at the time. Williams replied negatively to both questions. The manager said that he would talk to Purter and cautioned her not to confront Purter again at work, and that if Purter confronted her she should let her supervisor know.

Immediately thereafter, the human resources manager called Purter to his office, and Purter denied Williams's allegations. The manager noted that the clothes Purter was wearing did not match the description Williams had provided, in that he was wearing khaki pants. Purter told the manager that he had gone to the men's restroom, and that he and another male employee (Willie Haynes) entered the restroom, used it, and left at the same time. Purter denied any problems between himself and Williams, and also denied stopping at the water fountain. The human resources manager told Purter not to confront Williams and then excused him.

The human resources manager then spoke to Haynes and asked him if he had gone to the restroom with another employee. Haynes said that he and Purter had gone into the restroom together, used it, and left at the same time. The manager asked if Haynes had seen Purter go in or out of the women's restroom, and Haynes said he had not. Haynes also denied stopping at the water fountain or seeing anyone at the water fountain.

The human resources manager then spoke to Williams and told her that he did not have enough information to do anything at that time because it was her word against Purter's. Williams questioned why nothing was going to be done, and the manager said that the incident would be documented, but it would not be fair to discipline Purter without any evidence. The manager asked Williams whether "if she were in that position, wouldn't she want solid evidence that she had done something wrong," and Williams "seemed to agree" with him. Finally, the human resources manager discussed the incident with the manager of the distribution center (Steve George), and both agreed that

no further action should be taken given the lack of evidence. The manager wrote a detailed narrative account of his investigation.

During the rest of her employment, Williams never reported that she felt uncomfortable working around Purter and never requested reassignment to move away from him. When initially describing the restroom incident in her deposition, Williams testified that she had no other problems with Purter at work, nor did he say anything to her that made her feel uncomfortable. Later in her deposition, however, she testified that she remembered that Purter "scandalized her name." She said that the day of the incident, Purter was standing with some other men and, when she walked past, said,

> " 'Look at that bitch, that slut. She's telling—I mean, she's lying on me.' I have had other associates say that he's been going around calling me a stinky bitch, a lying whore...."

Russell Corporation states that it is committed to maintaining a work environment free from any type of unlawful discrimination, including sexual harassment. To that end, the company has adopted a policy prohibiting harassment, including a non-comprehensive list of behaviors that violate the policy and a detailed complaint-and-investigation procedure. Williams was aware that the company had an anti-harassment policy, had seen it posted, had read it, and understood how to make a complaint.

### B. Alleged Excessive Discipline

At about 10:30 a.m. on November 6, 1999, Saketa Wilkerson, an expediter, informed shift supervisor Tim Ashworth that, according to the computerized tracking system, Williams had not performed any work since 9:46 a.m. Ashworth was meeting with Steve George, the manager, at the time. George and Ashworth went to Williams's work location to determine if a problem existed. They discovered Williams out of her assigned work area, talking to a co-worker, Floyd Todd. Todd was Williams's then-boyfriend and current fiancé. Upon seeing George and Ashworth, Williams began scanning items, even though she was outside her assigned area.

Ashworth and George reviewed Williams's computerized work records, which showed that she had not performed any work from 9:46 a.m. to 10:36 a.m., a total of 50 minutes. At the time Williams was seen speaking with Todd, she was supposed to be pulling (removing) boxes in aisle C–39. However, the computerized tracking system showed that at 10:36 a.m., Williams removed a box of shirts from aisle D–59, an item that was neither in her work area nor was supposed to be removed. Shortly thereafter, according to the computerized tracking system, Williams returned to aisle C–39 and improperly replaced the box of shirts she had removed from aisle D–59 onto a shelf in aisle C–39.

Williams was called into the office to meet with George and Ashworth. Williams was advised that she had been caught loafing and that her scanning of the item in the wrong aisle constituted "manipulating the system." Williams was suspended for three days pending further investigation.

Russell Corporation has a discipline policy that classifies offenses in three categories: minor, major, and intolerable. For minor offenses, the company follows a progressive discipline procedure comprised of an informal verbal warning followed by

two written warnings prior to discharge. Employees who are charged with major offenses receive one formal written warning (which is active for six months) and, if another major offense is committed within this six-month period, the employee is discharged. According to the company's written policy, "loafing or leaving the work area without permission" is classified as a minor offense. "Excessive defective workmanship" is listed under both the minor and major offense sections, with a note saying "class as 'Minor' or 'Major' according to judgment."

The company's review of the incident, including Williams's own admissions, confirmed that Williams had not performed any work for approximately 45 minutes, was out of her work area, and had falsified inventory by improperly scanning an item in one location and then improperly restocking it in another location. Accordingly, when Williams returned from her suspension, she was issued a "major written reprimand" for "excessive defective workmanship" for her combined misconduct of loafing, being out of her work area, and improperly scanning items.

The written "reprimand form" completed as a result of the incident does not specifically mention improper scanning of items. Under "cause of reprimand," it states, "Excessive Defective Workmanship—Shandrinaye was seen by Steve George and Tim Ashworth in an aisle talking. Scan times show one hour of no work, plus she was out of her work area. This is a major and is in effect for 6 months until 5–10–2000."

In her deposition, Williams admitted that she was out of her work area when she was speaking with Todd, that she became nervous when Ashworth and George observed her talking, and that she then scanned an item in an aisle to which she was not assigned in order to give them the impression that she was returning to work. Williams further admits that the computer records show that she did not scan any items between 9:46 a.m. and 10:36 a.m. on that morning. However, Williams also testified that, during that time period, there had been a break for employees, and that some boxes fell off her pallet, so that she had to pick them up, contributing to the down time in which she was not scanning boxes. She said that she left her area because she realized that she did not have her keys, so she went to Todd's area to ask him if he knew where they were, and that she and Todd were trying to figure out where her keys could be when Ashworth and George saw them speaking. She said that she mis-scanned the boxes as a mistake, and not intentionally, because her mind was on her keys rather than her work.

Apparently, Williams was disciplined only one other time during her employment with Russell Corporation. On April 13, 2000, she received a minor reprimand when Steve George observed her out of her work area not at break time, using a cell phone.

## C. EEOC Charge

On November 19, 1999, Williams filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that she had been sexually harassed and retaliated against. In her charge, Williams identified the restroom incident as the sole basis for her sexual harassment allegation. In addition, Williams alleged that her written reprimand and suspension were in retaliation for her complaint regarding the restroom incident. Williams testified in her deposition in this case that her claim of retalia-

tion by excessive discipline is based on her belief that other employees were treated less severely than she was for similar misconduct.

Specifically, Williams asserted that Floyd Todd, her boyfriend, was not disciplined for the same incident in which she received a major reprimand and three-day suspension. Todd also was loafing but unlike Williams, he was in his work area, and there was no indication from the computerized tracking system that he had stopped working for any significant period of time or that he had improperly scanned any items. For these reasons, he was not disciplined on that occasion.

Williams also asserted that her co-worker Joe Brown was caught in the aisle on numerous occasions and has had comparable down-times in scanning items. She said that Brown told her on one occasion he had about 45 minutes of down-time and received only a minor reprimand. Company records show that Brown did receive minor reprimands for loafing, but was never observed out of his work area or intentionally mis-scanning items.

Williams asserted that her co-worker Joseph Racich was routinely late for or absent from work, had been caught in the break room on the telephone, and had been caught manipulating the system. Company records show that Racich did receive minor reprimands for loafing on two occasions that were ten months apart (and therefore not simultaneously active under the company's discipline policy) and a minor reprimand for manipulating his scan time on one other occasion. However, he was never observed simultaneously engaging in the conduct for which Williams was disciplined.

Williams asserted that her co-worker Robert Burton was caught loafing by a supervisor. Company records show that Burton did receive a minor reprimand on one occasion for loafing but was never observed out of his work area or intentionally mis-scanning items.

Williams was unaware of any other employee who did not receive a major reprimand for engaging in the same conduct for which she was disciplined. Company records show that Teresa Simonetti, another lift operator, was issued a major reprimand on May 24, 1999, for excessive defective workmanship when it was determined, via the computerized tracking system, that she had re-scanned items to create the impression that she was working.

On March 6, 2000, the EEOC contacted Williams and advised her that it had reached a tentative determination regarding her sexual harassment and retaliatory discipline claims. On or about August 8, 2001, the EEOC dismissed Williams's charge and issued her a notice of her right to sue.

### D. Job Transfer

In January 2000, as part of a company-wide down-sizing and restructuring, the distribution center reorganized and eliminated a significant number of jobs. The jobs that remained, including the remaining lift-operator jobs, were made available to employees on the basis of seniority. Williams's lift-operator job was eliminated. Williams was offered and accepted a material-handler-I job in the distribution center's shipping area.

In her complaint in this case, Williams alleged that the she was demoted to material handler I in retaliation for her earlier sexual-harassment complaint. Yet in her deposition, she said that the demotion was instead, or also, gender discrimination. Williams said she felt that the transfer was

in fact a discriminatory demotion because her pay decreased and her new duties included loading ("throwing") boxes—in her terms, a "man's job" that the women who transferred with her did not have to perform.

However, Williams also testified that she thought, but was not sure, that pay was reduced for everyone who moved to the material-handler-I job as a result of the reorganization. Moreover, Williams admitted that one of the two women who transferred with her, Maury Serles, did in fact work on the line, meaning that she performed the same duties as Williams, after they both transferred to the shipping area.

Williams contends that she requested to transfer back to the packing department, where she began as an employee, but was told by the human resources manager that only "temp" employees were being used for those jobs. Williams was unaware of any regular employee who was allowed to transfer to the packing department after the reorganization. According to the distribution center manager, Steve George, as part of the reorganization the company used temporary employees in the packing department and no regular employee was allowed to transfer to that department.

### E. Separation from Russell Corporation

In May 2000, Williams resigned from Russell Corporation. She told her supervisor that she wanted to return to school. After her resignation, Williams applied for but was denied unemployment benefits. On her application, Williams stated that she left Russell Corporation to return to school. However, in her deposition in this case, she testified that, in fact, she felt compelled to leave Russell Corporation. She said that she was no longer comforta-ble working at Russell Corporation because of the company's failure to take appropriate actions regarding the restroom incident and her major reprimand and suspension.

## III. DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Williams's allegations fall into two recognized categories of prohibited discriminatory conduct: sexual-harassment-hostile environment and retaliation.

### A. Sexual–Harassment–Hostile Environment

▇▇ A plaintiff can prove a violation of Title VII by showing that sexual discrimination has created a hostile or abusive work environment. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). The Eleventh Circuit set out the following elements of a prima-facie case of sexual harassment in *Gupta v. Florida Board of Regents,* 212 F.3d 571, 582–83 (11th Cir.2000): an employee must establish (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

▇▇ As to the fourth element, a hostile environment is created when the work-

place is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Factors that can be considered in determining whether a hostile environment was created include: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371. Williams has failed to establish a prima-facie case under this test, because the restroom incident about which she complains can only arguably be termed "harassment," and is in no way sufficiently severe or pervasive to warrant a finding of a hostile environment.

Williams alleges that, on one occasion, a male employee walked into the women's restroom while she was using it. She does not allege that he said anything, touched her, exposed himself, or even that he saw her in the bathroom. Her response brief claims that she felt physically threatened, but she did not make that claim either during the immediately following investigation or in her deposition. Nor is there any evidence to show that the incident unreasonably interfered with her job performance. Even assuming that her allegation about the incident is true, despite evidence to the contrary, this isolated incident does not remotely approach the level of severity or pervasiveness necessary to amount to a sexually hostile environment. There is not even any reason to assume that the male employee did not simply make an embarrassing but harmless mistake.

The type of conduct necessary to show a sexually hostile environment is well-documented in dozens of reported decisions from courts around the country. Many of these decisions describe conduct much more severe and pervasive than this, and yet still find no legal violation. There is no need to recount the unpleasant details of these cases; a partial listing will suffice. *See, e.g., Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246–48 (11th Cir.1999); *Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872–75 (5th Cir.1999), *cert. denied,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999); *Adusumilli v. City of Chicago,* 164 F.3d 353, 357 (7th Cir.1998), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1365–66 (10th Cir.1997); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993).

It is difficult to see how, in light of this precedent, any reasonable person could conclude that this incident met the legal requirements for a sexually hostile environment. Williams's response to the summary-judgment motion contains no colorable argument that it does. Rather, the response claims, improbably, that Williams was "terrified" that the man would "rape or harm her" and "feared for her life" when the man walked in, since she knew that "all of the construction noise" would muffle any sound from the restroom. Nowhere in Williams's contemporaneous written account, her deposition, or her supervisor's documentation is there any evidence of loud construction noise or that Williams feared for her life. This factual claim is first mentioned in an affidavit executed by Williams on April 12, 2002, two years and five months after the alleged incident.

Moreover, even if the court concluded that the incident constituted a hos-

tile environment, Russell Corporation would not be liable for it. Because Williams has alleged conduct by a co-worker, the company "is only liable if it 'knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action.'" *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 510 (11th Cir. 2000) (quoting *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir.2000)); *see also Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir.2002). "[T]he employer [must] exercise[ ] reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998).

Once Williams complained, her supervisors took immediate action to investigate her complaint. Although the supervisors could not substantiate her allegation, they spoke to the parties involved, told Williams to report any further problems, and thoroughly documented the incident and investigation. The human resources manager even took the proactive step of warning the accused male employee not to confront Williams, an appropriate step given that Williams had already confronted and accused him.

■ There is no set or bright-line test for determining when an employer has discharged its Title VII obligations to investigate sexual harassment complaints. *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298 (11th Cir.) ("We recognize that the wide variety of employment settings make it difficult to establish a uniform test for determining whether an employer's anti-harassment policy complaint procedures demonstrate the employer's reasonable care in preventing sexual

harassment."), *cert. denied*, 531 U.S. 926, 121 S.Ct. 303, 148 L.Ed.2d 243 (2000). Whether an employer's response is sufficient depends on, among other things, the effectiveness of the steps taken, that is, whether it was reasonably likely to prevent the misconduct from recurring. And what is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial steps.

Williams reported one relatively innocuous incident and admitted that she had no further problems with the co-worker or anyone else during her employment at Russell Corporation. Under these circumstances, Russell Corporation's response was both prompt and effective. That Williams now believes the company should have done more is immaterial. *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir.1997) ("Although [plaintiff] remains unsatisfied with [defendant's] resolution of her complaint, we have never stated—nor does [plaintiff] propose that we have ever held—that a complainant in a discrimination action has a right to the remedy of her choice."). Because Russell Corporation investigated promptly, because it took reasonable actions, and because the conduct complained of stopped completely, Russell Corporation's remedial efforts were both adequate and effective. Summary judgment is therefore appropriate on Williams's sexual-harassment-hostile-environment claim.

### B. Retaliation

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Williams alleges that three acts were retaliation for her complaint regarding the restroom incident and her EEOC charge: (1) her reprimand and suspension in November 1999; (2) her transfer to the shipping area in January 2000; and (3) her resignation, which she characterizes as a constructive discharge.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the allocation of the burden of production and an order for the presentation of proof in retaliation cases. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful retaliation by a preponderance of the evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A prima-facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory [or retaliatory] criterion." *International Broth. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

The Eleventh Circuit has established broad standards for a prima-facie case of retaliation. An individual alleging retaliation under Title VII must establish her prima-facie case by demonstrating "(1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to [her] protected activities." *Coutu v. Martin County Bd. of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir.1995). "The causal link element is construed broadly so that 'a

plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir.2001) (citations omitted).

If the plaintiff establishes a prima-facie case of retaliation, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-retaliatory reasons for its employment action. *Holifield*, 115 F.3d at 1564; *Olmsted*, 141 F.3d at 1460. "This intermediate burden is 'exceedingly light.'" *Holifield*, 115 F.3d at 1564 (citing *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir.1994)). The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–55, 258, 101 S.Ct. 1089, 1093–94, 1096, 67 L.Ed.2d 207 (1981).

Once the employer satisfies this burden of production, "the presumption of [retaliation] is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000) (citations omitted). The establishment of a prima-facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. System*, 701 F.2d 1383, 1389 (11th Cir.1983). After an employer proffers non-retaliatory

reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered ... reasons is pretextual." *Chapman,* 229 F.3d at 1037.

■■■■ First, there is the difficult question of whether Williams can make a prima-facie case of retaliation with regard to any of the three acts; more specifically, there is the difficult question of whether she engaged in "protected activity," as that term is defined under Title VII. Under Title VII, an employee participates in protected activity when, in the totality of circumstances, she had a good-faith, reasonable belief that the underlying employment practice was unlawful. *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 (11th Cir.1998), *cert. denied,* 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998); *Little v. United Technologies, Carrier Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997). However, not only must the employee subjectively believe that she was the victim of unlawful discrimination, but an objective, reasonable person under the same circumstances must be able to reach the same conclusion. *Harper,* 139 F.3d at 1388; *Little,* 103 F.3d at 960. Furthermore, "the objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1351 (11th Cir.1999). Although the conduct opposed need not actually be sexual discrimination, "it must be close enough to support an objectively reasonable belief that it is." *Clover,* 176 F.3d at 1351.

Admittedly, in the totality of circumstances presented by this case, while accepting all of Williams's allegations as true, no reasonable person could conclude that the one incident alleged by Williams— a male employee briefly walking into the women's restroom on one occasion, with no evidence of inappropriate physical contact or exposure—created a sexually hostile environment as that term is defined by the weight of case precedent. To the contrary, a review of Williams's own contemporaneous written account of the incident yields no evidence that the male employee had any idea Williams was in the restroom until she coughed or cracked open the stall door, that he actually followed her in, or that he had any intent to harm her.

Nevertheless, it must be kept in mind, as the Supreme Court recently wrote, that "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." *National Railroad Passenger Corporation,* —— U.S. ——, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002). "The 'unlawful employment practice' ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years." *Id.* Thus, and perhaps most importantly, "[i]n direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.*

Thus, in determining whether an employee had a good-faith, reasonable belief that an underlying harassing act was unlawful, the court must keep in mind that a woman may view a single act of harassment, while not actionable on its own, as potentially unlawful if repeated and not stopped. In other words, an harassing act that is not unlawful today may become so in light of later, then unknown, events. Thus, the question is posed: Does a woman have a reasonable belief that an underlying act (in particular, a first one) is unlawful sexual harassment when the act has

only the potential of being so, depending on the later actions of the alleged harasser and even the employer? The court need not answer this question today, for, even if Williams engaged in protected conduct, Russell Corporation is still entitled to prevail on her retaliation claims.

### 1. Retaliatory Discipline

■ Even if Williams could establish that she engaged in protected activity, her retaliatory-discipline claim fails because she cannot demonstrate a causal connection between her internal complaint and the company's actions. Clearly, Williams was not disciplined in retaliation for her EEOC charge because the discipline happened nine days before the EEOC charge was filed. Therefore, the court assumes Williams's retaliatory-discipline claim relates to her internal complaint about the restroom incident.

■ Assuming that Williams has established a prima-facie case, Russell Corporation has offered a legitimate, non-retaliatory reason for the discipline. Williams was observed outside of her work area engaging in a social conversation, had not been tracked on the computer system as working for more than 45 minutes, and mis-scanned an item to create the impression that she was working. While Williams offered a mitigating explanation for her conduct, she also admitted that she had engaged in it. Because "excessive defective workmanship" was a form of misconduct that could be classified as minor or major according to the supervisor's judgment, and because Williams was engaged in several forms of minor misconduct at one time, her supervisors clearly acted within their discretion in determining that a major reprimand and suspension were appropriate.

■ Williams attempts to rebut the company's reason for her reprimand and suspension by contending that other employees engaged in comparable conduct but were not as harshly disciplined. A review of the putative comparators demonstrates that none of them are similarly situated to her. The Eleventh Circuit has held that a plaintiff must demonstrate that she and her putative comparators are "similarly situated in all relevant respects.... 'In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.1998) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)). "In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir.2001) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir. 1999)).

None of Williams's comparators engaged in conduct "nearly identical" to that for which she was disciplined. During the same incident for which Williams was reprimanded, Floyd Todd was talking, but was not out of his own work area, did not have any significant down time, and did not mis-scan any items. Joe Brown did receive minor reprimands for loafing but was never observed out of his work area or mis-scanning items. Joseph Racich received two minor reprimands for loafing ten months apart and a minor reprimand for manipulating his scan time a third

time, but was never observed simultaneously engaging in the conduct for which Williams was disciplined. Robert Burton received a minor reprimand for loafing, but was never observed out of his work area or mis-scanning items. Williams herself received only a minor reprimand when she was observed out of her work area on another occasion. Finally, Teresa Simonetti did receive a major reprimand for "excessive defective workmanship," conduct similar to Williams's.

On these facts, this court cannot conclude that Williams was disciplined in retaliation for her complaint, or even unfairly at all. Because Williams cannot demonstrate pretext in Russell Corporation's proffered legitimate, non-retaliatory reason for disciplining her as it did, Russell Corporation will be granted summary judgment on this claim.

### 2. Retaliatory Demotion

Williams claimed in her complaint in this case that she was demoted in retaliation for her sexual-harassment complaint, but it is unclear from her deposition testimony whether she is converting this claim to one of discrimination or is merely adding a discrimination claim based on the same conduct. Initially, there is the question of whether the claim is properly before this court because Williams did not raise it in her EEOC charge. The scope of a judicial complaint under Title VII is limited by the scope of the EEOC's investigation reasonably arising out of the charge of discrimination itself. *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir. 1994). Though Williams's EEOC charge was not dismissed until August 2001, well after her transfer and separation from Russell Corporation, she never amended her EEOC charge to add these claims, nor is there any evidence that she ever made

the EEOC aware of them. Nevertheless, even if the claims were properly raised, Williams cannot establish a prima-facie case of retaliation or discrimination, nor can she demonstrate pretext in the reasons for her transfer.

■ In regard to the alleged retaliatory demotion, Williams has not offered any comments or conduct demonstrating, or even suggesting, that Russell Corporation's reorganization and her resulting loss of job and transfer were causally connected to either her internal complaint or her EEOC charge. Thus, she cannot establish a prima-facie case of retaliatory demotion. Moreover, Russell Corporation has offered a legitimate, non-retaliatory reason for its actions: the company-wide reorganization and downsizing of the Montgomery distribution center. Williams has not shown any pretext in this reason.

Williams claims that her transfer was retaliatory because her pay was decreased and because, as part of her new duties, she had to load (or "throw") boxes, a "man's job" that the other women who transferred with her did not have to perform. However, Williams admits that jobs were made available on the basis of seniority and that pay was reduced for everyone who moved to the job she accepted as a result of the reorganization. Williams also admits that one of the two women who transferred with her, Maury Serles, did in fact perform the same duties as she did after they transferred from the shipping area. Finally, that some women were treated more favorably than Williams, also a woman, because they did not have to throw boxes, clearly cannot support a prima-facie case of gender discrimination under the *McDonnell Douglas* framework. Williams has therefore offered no evidence to support a prima-facie case with regard to this

claim nor any evidence to indicate that the company's reasons for her job transfer and pay cut were pretextual. Russell Corporation is due summary judgment on this claim as well.

### 3. Retaliatory Constructive Discharge

■ Williams's final claim is that her resignation was not voluntary but instead was forced by Russell Corporation, that is, that she was constructively discharged. Again, there is the question of whether this claim is properly before this court because Williams did not include it in her EEOC charge. Moreover, Williams cannot establish a prima-facie case with regard to this claim because she cannot demonstrate that she was subjected to an adverse employment action or that any causal connection exists between her internal complaint or EEOC charge and her separation from Russell Corporation.

■ "The threshold for establishing constructive discharge ... is quite high." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1064, 151 L.Ed.2d 968 (2002). A plaintiff may succeed on a constructive discharge claim only if she demonstrates that " 'working conditions were so intolerable that a reasonable person in [her] position would have been compelled to quit.' " *Id.* (citations omitted). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Id.* (citations omitted). The plaintiff's subjective feelings about her employer's actions are not considered; instead, the standard is whether a reasonable person in her position would be compelled to quit. *Doe v. Dekalb Co. Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir.1998).

■ Williams has not offered any evidence that her working conditions were intolerable. She testified that she was compelled to resign because she "just didn't feel comfortable working with the company because [she] felt that they did not take the appropriate actions" with respect to her October 1999 complaint about the restroom incident and her November 1999 reprimand and suspension. As Eleventh Circuit precedent has established, Williams's subjective feelings about Russell Corporation's response to her complaint are immaterial and, where that response eliminated the conduct about which she complained, the response was reasonable. Moreover, the mere act of disciplining an employee, especially where, as here, the discipline was reasonable, does not create intolerable working conditions sufficient to create a constructive discharge. " [D]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.' " *Matvia v. Bald Head Island Management, Inc.*, 259 F.3d 261, 273 (4th Cir.2001) (citations omitted); *see also Summit v. S–B Power Tool*, 121 F.3d 416, 421 (8th Cir.1997), *cert. denied*, 523 U.S. 1004, 118 S.Ct. 1185, 140 L.Ed.2d 316 (1998).

In her deposition, Williams testified that after she complained about the restroom incident, she had no other problems with the alleged perpetrator, never reported that she felt uncomfortable working around him, and never requested reassignment to move away from him. In fact, other than her discipline in November 1999, Williams did not have any other complaints or concerns throughout the rest of her employment with Russell Corporation until her separation in May 2000. She testified that she left Russell Corporation in order to return to school. Under these circumstances, this court cannot conclude

that Williams was constructively discharged.

## IV. CONCLUSION

Russell Corporation having shown that it is entitled to summary judgment on all of Williams's claims, the court will enter an appropriate judgment.