Mehsati **HERAWI**, Plaintiff,

v.

**STATE OF ALABAMA DEPT. OF FORENSIC SCIENCES,**
Defendant.

**Civil Action No. 2:02cv1360–T.**

United States District Court,
M.D. Alabama,
Northern Division.

April 5, 2004.

1338

Eileen L. Harris, Joseph (Jay) Brady Lewis, The Law Office of Jay Lewis, Montgomery, AL, Maury Steven Weiner, Wiggins Childs Quinn & Pantanzis, PC, Birmingham, AL, for Plaintiff.

John J. Park, Jr., Office of the Attorney General, Montgomery, AL, for Defendant.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Mehsati Herawi, who is Iranian, brings this lawsuit alleging that defendant State of Alabama Department of Forensic Sciences discriminated against her because of her national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17. Specifically, she claims that the department terminated her (1) because of her national origin and (2) in retaliation for her complaints about discriminatory treatment; she further claims (3) that a department employee harassed her based on her national origin. The court's jurisdiction is properly invoked pursuant to 42 U.S.C.A. § 2000e–5(f).

This case is now before the court on the Forensic Department's motion for summary judgment. For the reasons discussed below, the motion will be granted in part and denied in part.

## I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Where, as here, the non-moving party bears the burden of proof at trial, "the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support ... [his] case, or present 'affirmative evidence demonstrating that the non-moving party will be unable to prove ... [his] case at trial.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir.1994) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir.1991) (en banc)). Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To this end, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

Herawi was born in Iran, and she trained as a doctor in Germany. She came to the United States in 1993 to train as a forensic pathologist. She is currently a legal resident of the United States and has applied to become a citizen. From 1993 to 1998, she was a resident in pathology at Texas Tech University, and, from 2000 to 2001, she was a forensic fellow in the office of the chief medical examiner in Baltimore, Maryland.

In the spring of 2001, Dr. J.C. Upshaw Downs, the Director of the Alabama Department of Forensic Sciences and the Chief Medical Examiner for Alabama, recruited Herawi to come to work for the department. Herawi began work at the department on July 23, 2001. At first, she worked in the Tuscaloosa office, but she was transferred to the Montgomery office effective October 1, 2001. During the relevant time period, Herawi's supervisor in the Montgomery office was Dr. Emily Ward; Ward's supervisor was Craig Bailey, the director of the Montgomery Regional Laboratory; and the department's director was Downs. Herawi, like all state employees, was a probationary employee for her first six months on the job.

Ward was highly critical of Herawi almost immediately upon her arrival in the Montgomery office. On her first day at work, Ward accused Herawi of being inconsiderate for not offering to help her. Ward looked at Herawi with a "hatred filled stare" and mocked her by repeating her in a high-pitched voice.[1] On or about October 22, 2001, Ward became enraged at Herawi, shouted at her, accused her of wrongdoing, and said she had had enough of Herawi and that Herawi was the rudest person she had ever met. When Herawi tried to explain her actions, Ward yelled louder and said that she did not like Herawi and that no one else liked her either.

On October 24, Herawi expressed to Craig Bailey, the office director, her concerns about the way Ward was treating her. Bailey later told Herawi that, after his conversation with her, he spoke to Ward to find out if she had a problem with people of Middle Eastern descent. Bailey told Herawi that people from the Middle East were perceived as rude and aggressive.

On November 7, Ward "implied" to Herawi that she was getting calls from people asking about Herawi's background and her accent, and she threatened to expose Herawi's nationality to law enforcement agencies.[2] Ward also said that she was getting calls from people asking who Herawi was, asking why she was there, and stating that she did not belong there.

Herawi had two more run-ins with Ward in December 2001, after Herawi had taken time off in November to visit her mother in California after the death of her father. On December 6, Ward called Herawi into her office, where Bailey yelled at Herawi, accusing her of neglecting the office after her father died and not performing enough autopsies. Bailey also questioned Herawi about whether she was looking for a job in California. On or about December 25, Herawi confronted Ward about whether Ward had spread a rumor that Herawi was looking for a job in California.

On January 2, 2002, Herawi received an "employee probationary performance appraisal" and an attached narrative performance appraisal, dated November 15, 2001. The narrative performance appraisal states that Herawi "appears to be a very intelligent and dedicated Forensic Pathologist" and that she "seems to have been well trained."[3] The narrative appraisal, however, goes on to state that "her performance has been problematic in four inter-related areas: expectations of co-workers, recognition of and subordination to authority, incessant inquisitiveness, and lack of organization."[4] It also states that Herawi "comes across as very self-centered and projects an 'entitlement complex'"; that she "has also refused to comply with departmental regulations and/or rules if she doesn't agree with them"; and that her "work habits leave room for improvement."[5] The narrative was signed by Ward and Downs as well as by Dr. Johnny R. Glenn, a Deputy Medical Examiner, for himself and for Dr Joseph H. Embry, another Regional Medical Examiner.

The "employee probationary performance appraisal," signed by Ward and Herawi, gives Herawi an average rating of 1.57 out of four on seven "responsibilities," including "handles evidence/case materials"

---

1. Plaintiff's response, etc., filed January 12, 2004 (doc. no. 31) (plaintiff's response), exh. 1, declaration of Mehsati Herawi (Herawi decl.), at 3.

2. *Id.* at 5.

3. Plaintiff's response, exh. 5, performance appraisal, at 1.

4. *Id.*

5. *Id.* at 1, 2.

and "analyzes evidence/case materials/gathers case history."[6] Based on this average score, the performance evaluation concludes that Herawi's work partially met standards.

On the day that Herawi received her performance evaluation, Ward again made reference to Herawi's national origin. Ward suggested that she was receiving calls about Herawi and that people wanted to know where Herawi was from and why she was there. Ward suggested that she was getting these calls because of Herawi's accent. At this meeting, Ward and Herawi also discussed Herawi's performance appraisal. Ward alluded to the fact that she knew people all over the country and that if Herawi left the department she would make sure Herawi would not get a job anywhere else.

Herawi brought her concerns about Ward to Downs on January 4, 2002. Herawi told Downs that Ward had threatened to expose her nationality; Herawi also told Downs that she felt confused and intimidated. Downs told Herawi that Middle Eastern people were generally facing troubles in the wake of the terrorist attacks on September 11, 2001, and that Herawi should turn the other cheek. However, Downs said he would speak to Ward.

On January 9, 2002, Downs wrote a letter to Thomas Flowers, the state personnel director, requesting that Herawi's probationary period be extended by three months. Downs wrote that Herawi "re-

quires additional training in autopsy procedures to take a more organized approach to the process" and that she "must also learn to use the chain of command."[7]

The relationship between Ward and Herawi did not improve after Downs spoke to Ward. On January 3, Herawi accidently cut the carotid artery during an autopsy. A county coroner called her to report that the funeral home handling the body called him to complain because, due to the cut in the carotid artery, it had not been able to do a proper embalming and the family of the deceased was upset. Ward wrote a memorandum to Downs about this incident and noted that the coroner said to her that Herawi did not appear concerned about the inconvenience that she had caused.[8]

On January 14, Ward "smirked" at Herawi during a weekly meeting while Herawi presented an autopsy she had done on an apparent suicide.[9] The deceased had died of a drug overdose and had left a note describing her emotional pain. Ward again wrote a memorandum on this incident, noting that "Herawi was focusing more on the emotional state of the decedent than on the entire scenario of the death investigation."[10]

On January 30, Ward interrogated Herawi during her presentation of a homicide case. Ward, again, described this incident in a memorandum, writing that Herawi "has continued to be argumentative and responding [sic] angrily when questioned about her autopsy findings."[11]

**6.** Plaintiff's response, exh. 5, employee probationary performance appraisal, at 2.

**7.** Memorandum in support of motion for summary judgment, filed November 12, 2003 (doc. no. 21) (defendant's memo.), exh. 3 to affidavit of Steven Christian, letter to Thomas G. Flowers, dated January 9, 2002, at 1.

**8.** Defendant's memo., exh. 6 to affidavit of Steven Christian, memorandum to Dr. J.C. Upshaw Downs, dated February 5, 2002, at 1.

**9.** Herawi decl. at 9.

**10.** Defendant's memo., exh. 4 to affidavit of Steven Christian, memorandum, dated January 14, 2002, at 1.

**11.** Defendant's memo., exh. 5 to affidavit of Steven Christian, memorandum, dated January 30, 2002, at1.

On February 5, 2002, in the course of an autopsy on a fire victim, Herawi, without asking Ward's permission, sent a blood sample to an outside laboratory for confirmation that the victim died of carbon dioxide inhalation. It was Herawi's understanding the cost of outside test was low enough that she did not need approval. The following day, Ward criticized Herawi for. ordering the test without permission. Ward wrote a memorandum on this incident as well, stating that "Herawi defiantly refused to comply with department requests about outside laboratory tests." [12]

On February 13, Ward accused Herawi of causing problems because Herawi would not release information from an autopsy. When Herawi explained that she wanted to wait until she had complete information, Ward yelled that if she could not make a decision, she should leave. On February 19, Ward questioned Herawi in front of other department employees about whether she would get her autopsies done in time.

Ward alluded to Herawi's nationality again on March 7, 2002. Ward told Herawi that nobody liked her, that everybody complained about her, that she did not belong there, that should leave, and that her English was bad. After this incident, Herawi complained to Downs again on March 21, about Ward's hostility. At this meeting, Downs told Herawi that he would start an investigation, and Herawi told Downs that she had contacted a lawyer. Herawi also complained to Samuel Mitchell, the department chief of staff, on March 25. [13]

Events came to a head on March 28, at a meeting attended by Herawi, Ward, Bailey and Steve Christian, the department's personnel Manager. Herawi claims that she was terminated during the meeting and that when she met with Christian shortly after the meeting, he told her it was unofficial policy that terminated employees could submit a letter of resignation. [14] Memoranda written by Ward, Bailey and Christian present slightly different accounts. According to Ward, she informed Herawi that the situation was not working out and that the department had not seen any improvement in the areas identified in Herawi's performance appraisal. [15] According to Ward, before she could finish, Herawi interrupted her to say she would quit. According to Bailey, Ward requested Herawi's resignation, and Herawi agreed. [16] According to Christian, Ward told Herawi that an offer of permanent employment would not be forthcoming and then told Herawi to speak with him later that day. [17] When they met, according to Christian, he told her it was the department's unofficial policy to allow employees to resign to make it easier to look for work in the future.

Herawi submitted a letter of resignation on April 1, 2002. [18] A letter from Downs, dated April 18, confirmed Herawi's "separation from employment" at the department effective April 19. [19] Downs's letter

12. Defendant's memo., exh. 7 to affidavit of Steven Christian, memorandum to Dr. J C U Downs, at 1.

13. Plaintiff's response, exh. 4, memorandum to file from Samuel L. Mitchell, dated March 26, 2002, at 1.

14. Herawi decl. at 11.

15. Defendant's memo., exh. 9 to affidavit of Steven Christian, memorandum to file, at 1.

16. Defendant's memo., exh. 13 to affidavit of Steven Christian, memorandum to file, dated September 17, 2002, at 1.

17. Defendant's memo., exh. 10 to affidavit of Steven Christian, memorandum to file, dated March 28, 2002, at 1.

18. Plaintiff's response, exh. 10, letter to J.C. Upshaw Downs, M.D., dated April 1, 2002, at 1.

19. Plaintiff's response, exh. 11, letter to Mehsati Herawi, M.D., dated April 18, 2002, at 1.

states that the reason for Herawi's separation is that she continued "to require additional training in autopsy procedures and failure to properly use the chain of command." [20]

After Herawi's separation from the department, she was sent an offer of an employment contract by the department. [21] The contract called for Herawi to provide court testimony, to appear as an expert witness, to prepare and instruct scientific and law enforcement personnel, and to provide technical review of cases.

## III. ANALYSIS

Herawi claims that (1) she was terminated because of her Iranian origin; (2) she was fired in retaliation for her complaints about Ward; and (3) she was harassed because of her national origin. The Forensic Department has moved for summary judgment on the ground that its decision not to offer her a permanent position was based on legitimate, non-discriminatory reasons. The court will consider Herawi's claims in order.

### A. Termination

Herawi contends that the Forensic Department terminated her because of her national origin in violation of Title VII. [22] The department moves for summary judgment on the ground that it had a legitimate non-discriminatory reason for terminating her. The court finds that summary judgment is not appropriate because Ward's comments to Herawi are sufficient circumstantial evidence to create a genuine issue for trial as to whether Herawi's na-

tional origin was a motivating factor in the department's decision to terminate her.

#### i.

Title VII provides that, "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C.A. § 2000e–2(a). "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice ..., the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C.A. § 2000e–5(g)(1).

In 1991, Title VII was amended to expand the available remedies. The 1991 amendments provide, in relevant part, that, "[i]n an action brought by a complaining party ... against a respondent who engaged in unlawful intentional discrimination ... the complaining party may recover compensatory and punitive damages ..., in addition to any relief authorized by [42 U.S.C.A. § 2000e–5(g) ], from the respondent." 42 U.S.C.A. § 1981a(a)(1).

The 1991 amendments further clarified or redefined when liability attaches under

---

**20.** *Id.*

**21.** Plaintiff's response, exh. 13, contract review report and contract.

**22.** The record presents some question whether Herawi was terminated or she resigned. As discussed above, Herawi submitted a letter of resignation, but she alleges that she was terminated. Herawi decl. at 11. She claims

that she submitted the letter of resignation only after she was told that it was the unofficial policy of the department that terminated employees could do so to improve their chances of finding a job in the future. *Id.* Neither party argues that this issue affects the outcome of the case, however, and, in any event, the court is required at this stage to construe the evidence in the light most favorable to Herawi.

Title VII. The amendments provide that "an unlawful employment practice is established when the complaining party demonstrates that ... national origin ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e–2(m). In addition, the 1991 amendments provide that, "[o]n a claim in which an individual proves a violation ... and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court ... (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) ...; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." 42 U.S.C.A. § 2000e–5(g)(2)(B).

### ii.

■ The parties argued their positions on summary judgment in the terms of the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* approach, a plaintiff has the initial burden of establishing a prima-facie case of unlawful sex discrimination by a preponderance of the evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A prima-facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). A plaintiff's prima-facie case raises a presumption of illegal discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

■ If the plaintiff establishes a prima-facie case, the burden then shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for its employment action. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997). "This intermediate burden is exceedingly light." *Id.* (internal quotations and citations omitted). The defendant has a burden of production, not persuasion, and does not have to persuade a court that it was actually motivated by the reason advanced. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253–55, 258, 101 S.Ct. at 1093–94, 1096.

■ Once the defendant satisfies this burden of production, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima-facie case, sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.' " *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir.2000) (en banc) (citations omitted).

■ However, the establishment of a prima-facie case does not, in itself, entitle a plaintiff to defeat a summary-judgment motion. *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.1987); *Pace v. Southern Ry. System*, 701 F.2d 1383, 1389 (11th Cir.1983). After a defendant proffers a nondiscriminatory and legitimate reason for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman*, 229 F.3d at 1037.

### iii.

At the court's request, the parties later briefed the question of whether the Su-

preme Court's recent decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), modified, or even abrogated, the *McDonnell Douglas* framework or approach. In *Desert Palace*, the Court held that, in order to obtain a mixed-motive jury instruction under Title VII, 42 U.S.C.A. § 2000e–2(m), "a plaintiff need only present sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence, that 'race, color, religion, sex, or national origin' was a motivating factor for any employment practice" and that a plaintiff need not present 'direct evidence' of discrimination to obtain the mixed-motive jury instruction. 539 U.S. at 101, 123 S.Ct. at 2155.

Because the standard for when an issue can go to the jury is the same as the summary-judgment standard, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986), some courts have concluded that *Desert Palace* alters the summary-judgment analysis for every Title VII claim. *See, e.g., Dunbar v. Pepsi–Cola General Bottlers of Iowa, Inc.*, 285 F.Supp.2d 1180, 1196 (N.D.Iowa 2003) (Bennett, C.J.). Other courts have gone further to hold that *Desert Palace* spells the end of the *McDonnell Douglas* burden-shifting paradigm all together. *See, e.g., Dare v. Wal–Mart Stores, Inc.*, 267 F.Supp.2d 987, 990–91 (D.Minn.2003) (Magnuson, C.J.).

For a number of reasons, to paraphrase Mark Twain, reports of the death of *McDonnell Douglas* are exaggerated. As stated, in *Desert Palace*, the Supreme Court merely held that a plaintiff need not present 'direct evidence' to establish liability—partial or full—under Title VII, but that a plaintiff may do so by "using direct or circumstantial evidence." 539 U.S. at 99, 123 S.Ct. at 2154 (internal quotations and citations omitted). *Desert Palace* addressed whether direct evidence is necessary to establish Title VII liability.

*McDonnell Douglas*, in contrast, did not address the necessity of direct evidence but rather articulated one methodology for establishing liability through circumstantial evidence. The *McDonnell Douglas* approach is a "procedural device," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 521, 113 S.Ct. 2742, 2755, 125 L.Ed.2d 407 (1993); "it is ... a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (internal quotations and citations omitted). There is nothing in *Desert Palace* to undermine the usefulness of *McDonnell Douglas*.

As this court has observed before, cases of alleged discrimination "pose difficult and sensitive issues of subjective intent and objective action." *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1167 (11th Cir.2003) (adopting decision of district) (internal quotations and citations omitted). "The *McDonnell Douglas* analysis provides an invaluable method of progressively sharpening the inquiry into the elusive factual question of intentional discrimination." *Id.* (internal quotations and citations omitted). "Positing such elementary *McDonnell Douglas* questions as whether the elements for a prima facie case are present ..., the clarity and nature of the employer's justification, and whether the justification is pretextual and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim ... the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis." *Id.*

However, because, as stated, "the *McDonnell Douglas* analysis is only a procedural device, it should not be applied too rigidly; nor should it be viewed as an end in itself.... [T]he mere disbelief of the

employer's proffered reason does not compel a finding of discrimination." *Id.* (internal quotations and citations omitted) As the court, in *Hall,* cautioned, "the *McDonnell Douglas* approach should not be used by the court as a substitute for reaching the ultimate issue of whether the employee has, in fact, been a victim of discrimination." *Id.* (internal quotations and citations omitted).

■ With this understanding of *McDonnell Douglas's* benefits and limitations, there is nothing in *Desert Palace* that undermines the continued usefulness of *McDonnell Douglas* to trial courts, in either single- or mixed-motive cases based on circumstantial evidence, for assessing Title VII liability. McDonnell Douglas forces a defendant, where the prima-facie-case threshold is met, to articulate each and every reason for its action and then required a plaintiff to show why each reason is a pretext for impermissible discrimination. *McDonnell Douglas* is still good law, and it is the appropriate heuristic device to use in this case.

### iv.

■ Applying *McDonnell Douglas,* this court concludes that Herawi has met her prima-facie burden of producing "evidence adequate to create an inference that [the Forensic Department's] employment decision was based on a[n] [illegal] discriminatory criterion." *Int'l Bhd. of Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866. To establish a prima-facie case of discriminatory discharge, she must show the following: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was discharged despite her qualification; and (4) some additional evidence that would allow an inference of discrimination. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984); *White v. Verizon South, Inc.,* 299 F.Supp.2d. 1235, 1241 (M.D.Ala.2003) (Thompson, J.).

■ Herawi has sufficient evidence to establish the first three elements of the prima-facie case. First, as an Iranian, she is a member of a protected class. *See Moghadam v. Morris,* 87 F.Supp.2d 1255, 1263 (N.D.Fla.2000) (Vinson, C.J.) (undisputed that plaintiff of Iranian descent was within protected class based on national origin). Second, the record shows that she was qualified for her position: she is a doctor, she trained as a forensic pathologist, and she has experience in the field of forensic pathology. Third, she was terminated. The department does not dispute this much.[23]

Traditionally, to meet the fourth element of the prima-facie Title VII case, a plaintiff alleging discriminatory treatment was required to show that she was replaced by someone who was not a member of her protected class or that a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. *See Nix,* 738 F.2d at 1185. Herawi has neither evidence that she was replaced by someone who was not a member of her protected class nor evidence that a similarly situated department employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged. The department goes further to argue that a Dr. Bristol, who is not a

---

**23.** The department's contention that Herawi was terminated because she "continue[d] to require additional training in autopsy procedures," Plaintiff's response, exh. 11, letter to Mehsati Herawi, M.D., dated April 18, 2002, at 1, could be characterized as an argument that Herawi has not established the second element of a prima-facie case. However, the department does not make that argument; rather, the department characterizes its rationale for terminating Herawi as being relevant to its legitimate non-discriminatory reason for terminating Herawi at the second *McDonnell Douglas* step. Defendant's memo. at 8.

member of a protected class, had similar employment problems to Herawi's and was treated similarly. Whether or not Bristol is an appropriate comparator, Herawi has offered no evidence that her place in the department was taken by a non-protected individual and no evidence of a similarly situated non-protected department employee who was treated differently than she was. Under these circumstances, courts have frequently held that the plaintiff does not have a genuine issue of material fact fit to go to a jury. *See, e.g., Davis v. Qualico Miscellaneous Inc.,* 161 F.Supp.2d 1314, 1319 (M.D.Ala.2001) (Thompson, J.); *Keel v. United States Dept. of Air Force,* 256 F.Supp.2d 1269, 1286 (M.D.Ala.2003) (Fuller, J.).

■ The court is mindful, however, that, as a general rule, "[d]emonstrating a prima-facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination," *Holifield,* 115 F.3d at 1562, and that there are ways to raise the inference of discrimination other than showing that a similarly situated individual from outside the protected class was treated differently, *see, e.g., id; Howard v. Roadway Exp., Inc.,* 726 F.2d 1529, 1534 (1984) (rejecting the argument that the black plaintiff could not establish a prima-facie case of discriminatory discharge because she was replaced by another black person). Indeed, as this court recently noted, "courts have rejected a rigid application of the prima-facie case." *White,* 299 F.Supp.2d. at 1241.

■ The court finds that Ward's comments about Herawi's Iranian origin are sufficient to create the inference of discrimination. Evidence of even "isolated and stray remarks" related to a protected characteristic can be sufficient to create a prima-facie case of discrimination. *Dickson v. Amoco Performance Products, Inc.,* 845 F.Supp. 1565, 1569–70 (N.D.Ga.1994) (Hall, J.). In *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497 (11th Cir.1991), the court held that the plaintiff had met his burden of establishing a prima-facie case of age discrimination by introducing evidence of his supervisor's comment to the effect that the plaintiff was too old. Furthermore, as a general rule, remarks that show bias are particularly probative of discrimination when they are made by the person charged with making the employment decision at issue. *See, e.g., Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 931 (11th Cir.1995); *E.E.O.C. v. Alton Packing Corp.,* 901 F.2d 920, 924 (11th Cir.1990).

In this case, Ward made remarks related to Herawi's national origin on three occasions. On November 7, 2001, Ward threatened to report Herawi's national origin to law enforcement agencies. On January 2, 2002, Ward told Herawi that she was getting calls asking who Herawi was and why she was working there; Ward suggested that she was getting these calls because of Herawi's accent. Finally, on March 7, 2002, Ward told Herawi that no one liked her, that she did not belong at the department, that she should leave, and that her English was bad. It is undisputed that Ward was Herawi's direct supervisor when she made these remarks and that Ward had substantial input into the ultimate decision to terminate Herawi. In fact, Ward conducted Herawi's January 2002 performance appraisal, and she wrote the four memoranda in February and March of 2002 documenting incidents involving Herawi.[24] Given this evidence, the

---

24. The fact that Ward was Herawi's supervisor and had direct input into the decision-making process distinguishes this case from *Jones v. Bessemer Carraway Medical Center,* 151 F.3d 1321, 1323 (11th Cir.1998), in which the Eleventh Circuit held that racist comments by one of the plaintiff's supervisors were not sufficient to establish a prima-facie case of discriminatory discharge. The court's rationale in *Jones,* however, was that the su-

court is satisfied that Herawi has raised the inference that her national origin was a motivating factor in the department's decision to terminate her.

■ The burden thus shifts to the Forensic Department to articulate a legitimate non-discriminatory reason for its decision to fire Herawi. *Holifield,* 115 F.3d at 1564. The department has met this "exceedingly light" burden. *Id.* It asserts that Herawi was not retained because she "had problems with autopsy procedures and with the chain of command." [25] Plainly, job performance, failure to follow instructions, and insubordination are all legitimate, non-discriminatory considerations. *See, e.g., Kelliher v. Glickman,* 134 F.Supp.2d 1264, 1274–75 (M.D.Ala. 2001) (McPherson, M.J.), *aff'd,* 313 F.3d 1270 (11th Cir.2002).

■ Because the department has met its burden, Herawi must show that its asserted reasons are pretextual. *Chapman,* 229 F.3d at 1024. The court finds, again, that the evidence of Ward's comments about Herawi's national origin is sufficient for Herawi to meet her burden. Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext. *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1362 (11th Cir. 1999); *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir.1998). "[W]hether comments standing alone show pretext depends on whether their substance, context, and timing could permit a finding that the comments are causally related to the adverse employment action at issue." *Bonham v. Regions Mortgage, Inc.,* 129

F.Supp.2d 1315, 1332 (M.D.Ala.2001) (Thompson, J.).

■ In this case, Ward's comments "might lead a reasonable jury to disbelieve [the department's] proffered reason for firing" Herawi. *Ross,* 146 F.3d at 1292. Ward's threat that she would report Herawi's nationality to law enforcement makes it clear that she was antagonistic towards Herawi because of Herawi's Iranian origin. Ward's later comment that Herawi did not belong in the department, made at the same time she commented on Herawi's accent, further evinced discriminatory animus. Standing alone, this might not be enough evidence to establish a genuine question of pretext, but Ward was Herawi's supervisor, conducted her performance appraisal, and wrote four memoranda containing negative evaluations of her. In this context, the evidence suggests that Ward's evident dislike for Herawi's national origin may have infected the process of evaluating Herawi. The timing of Ward's remarks reinforces this conclusion. The first incident in which Ward referred to Herawi's nationality occurred one week before the narrative performance appraisal of Herawi was written, the second incident occurred on the same day—January 2, 2002—that Ward completed the performance appraisal form, and her final remarks were made three weeks before Herawi was fired. Because of this close temporal proximity, a jury could reasonably conclude that discriminatory attitude evidenced in Ward's remarks motivated the decision to fire Herawi. *Damon,* 196 F.3d at 1363. Accordingly, the court finds that Herawi has met her burden and that sum-

pervisor who made the remarks was not the same supervisor who referred the plaintiff to the discipline committee that ultimately terminated her and that the referring supervisor did not rely on the report by the supervisor who made the remarks. 151 F.3d at 1323. This case is different because, while Downs

was the ultimate decision-maker in this case, there is evidence that Ward had substantial input in the decision by way of her performance appraisal and her memoranda.

**25.** Defendant's memo. at 8.

mary judgment on her termination claim is not appropriate.

## B. Retaliation

Herawi contends that the Forensic Department retaliated against her for complaining to Downs and to Mitchell about Ward's conduct. The department has moved for summary judgment, again, on the basis that its employment decision was motivated by legitimate, non-discriminatory reasons.

Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A.2000e–3(a). The same *McDonnell Douglas* burden-shifting framework that applies to claims of discriminatory discharge applies to claims for retaliation. *Williams v. Russell Corp.*, 218 F.Supp.2d 1283, 1295 (M.D.Ala.2002) (Thompson, J.).

■ The Eleventh Circuit has established broad standards for a prima-facie case of retaliation. An individual alleging retaliation under Title VII must establish her prima-facie case by demonstrating "(1) that she engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to [her] protected activities." *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir.1995). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir.2001) (internal quotations and citations omitted).

■ Herawi has established the elements of a prima-facie case of retaliation. First, she was engaged in protected activity on the two occasions that she spoke with Downs and on the one occasion she spoke to Mitchell. *See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir.2001) (statutorily protected activities include internal complaints to supervisors about harassment). Second, Herawi was terminated. Third, Herawi satisfies the causality requirement because she was terminated only a week after her meeting with Downs and three days after her meeting with Mitchell. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.1999) (close temporal proximity between when a supervisor learns of protected activity and adverse employment action is enough to satisfy causality prong).

■ Because Herawi has produced evidence sufficient to meet her prima-facie burden, the burden of production shifts to the Forensic Department to produce a legitimate, non-retaliatory reason for its decision. *Williams*, 218 F.Supp.2d at 1295. As discussed above, the department has offered legitimate reasons for its decision. The department contends that it fired Herawi because of her problems with autopsy procedure and her problems following the chain of command. The burden thus shifts to Herawi to come forward with evidence sufficient for a reasonable fact finder to conclude that the department's asserted reasons were pretext for retaliation.

■ Herawi has met this burden. As discussed above, Herawi has presented substantial evidence of Ward's animus towards her and thus raised a very real question about the extent to which the department's assessment of her might have been influenced by Ward's attitude. There is also evidence from which a reasonable fact finder could conclude that

Ward's assessment of Herawi was infected by a retaliatory motive. In October 2001, Bailey reported to Ward that Herawi had complained to him about her, and, in January 2002, Downs spoke to Ward about Herawi's complaints. Thus, at the same time that Ward was evaluating and assessing Herawi's job performance in the fall of 2001, and the winter of 2002, she was aware that Herawi had gone to various supervisors to complain about her. The court also considers it relevant to determining pretext that Herawi was dismissed so soon after she complained to Downs and Mitchell.[26] While temporal proximity, standing alone, may not be enough to create a genuine issue of pretext, it is a relevant factor. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir.1998). Thus, taking into consideration the evidence of Ward's discriminatory animus, her possible retaliatory motive, and the extreme closeness in time between Herawi's complaints and her dismissal, the court concludes that Herawi has evidence sufficient for a reasonable fact finder to conclude that the department's asserted reasons for her dismissal were pretextual.

### C. Hostile Environment

Finally, Herawi contends that she was subjected to a hostile work environment because of her national origin, in violation of Title VII. The Forensic Department did not squarely address this issue in its summary-judgment brief, but neither did Herawi explicitly raise the claim in her complaint. Nevertheless, the court concludes that summary judgment is appropriate on this claim because Herawi does not have evidence of comments, remarks, or behavior that rise to the level of actionable harassment. As discussed above, the court is persuaded that Ward's comments are circumstantial evidence of discrimination, but it cannot find enough evidence that they created a hostile environment to take this issue to the jury.

■ To establish a prima-facie case of harassment, an employee must establish (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is liable for the hostile environment under either a theory of direct or vicarious liability. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000). Here, the court need not address the other elements of the prima-facie case because it finds that Herawi cannot meet the fourth requirement.

■ A hostile environment is created when the workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Factors that can be considered in determining whether a hostile environment was created include: "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

---

**26.** The court also notes that it was only five days after Herawi complained to Downs about Ward's conduct in January 2002, that Downs wrote his letter to Thomas Flowers, the director of the state's personnel department, requesting that Herawi's probationary period be extended.

work performance." *Id.* at 23, 114 S.Ct. at 371. Herawi's evidence shows that Ward yelled at her on a number of occasions; that Ward told her that no one liked her, that she did not belong in the department, and that people were calling to ask about her; that Ward threatened to report her to law enforcement; and that Ward stared or smirked at her and mocked her by repeating her in a high-pitched voice. The court cannot find that a reasonable person would objectively find that these comments, while hostile and offensive, were sufficiently hostile or abusive and pervasive to establish a Title VII hostile environment claim. For this reason, the court finds that summary judgment is appropriate in favor of the department on this claim.

## IV. CONCLUSION

For the reasons given above, it is ORDERED as follows:

(1) The motion for summary judgment, filed by defendant Alabama Department of Forensic Sciences on November 12, 2003 (doc. no. 20), is granted with respect to plaintiff Mehsati Herawi's hostile-environment claim.

(2) Said motion is denied in all other respects.

DONE, this the 5th day of April, 2004.