Bella Zaslavaskaya BOEX, Plaintiff,

v.

OFS FITEL, LLC, a Delaware Limited Liability Company, Defendant.

No. CIV.A.1:03–CV–1595–C.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 7, 2004.

Stephen M. Katz, Betts & Katz, Atlanta, GA, for Plaintiff.

Robert Steven Ensor, Makila A. Sands, Alston & Bird, Atlanta, GA, for Defendant.

## *ORDER*

COOPER, District Judge.

Pending before the Court is Defendant OFS Fitel, LLC's Motion for Summary Judgment [Doc. No. 15–1]. For the reasons set forth below, the Defendant's Motion is granted.

Plaintiff Bella Zaslavaskaya Boex ("Plaintiff"), who is of Russian–Jewish ancestry, brings this employment discrimination action against her former employer, OFS Fitel, LLC ("Defendant" or "OFS"). Plaintiff alleges Defendant terminated her because of her race/ancestry in violation of 42 U.S.C. § 1981. Plaintiff likewise alleges claims for intentional infliction of emotional distress and negligent retention.

## I. STATEMENT OF FACTS

### A. The Initial Years of Boex's Employment With Lucent and OFS

On August 2, 1998, Plaintiff began her employment with Lucent Technologies ("Lucent") as an engineer in the Copper Cable Research and Development ("R & D") Department. (DSMF[1] ¶ 6.) OFS, the defendant in this action, was formed in November of 2001, as a result of the sale of Lucent's Optical Fiber Solutions business to Furukawa Electric. (Id. at ¶ 1.) Defendant is a global telecommunications company that develops, manufactures, distributes, and sells fiber optic cable and components. (Id. at ¶ 2.) Defendant operates fiber optic plants in Germany, Brazil, Denmark, and several locations in the United States, including Norcross, Georgia. (Id. at ¶ 3.)

Prior to Defendant's acquisition of Lucent, Plaintiff transferred into another engineering position in the Fiber R & D Department. (Id. at ¶ 7.) Among Plaintiff's job responsibilities in the R & D Department were prototyping, taking measurements, analyzing data, and modifying designs. (Id. at ¶ 8.) In addition, Plaintiff interacted with customers to discuss technical aspects of Defendant's products. (Id.) Plaintiff had little involvement in selling Defendant's products and working with Defendant's sales force, and her contact with Defendant's personnel at production facilities was generally limited to communications about technical aspects of Defendant's products. (Id.)

### B. Boex's Transfer Into Product Line Management

Due to declining revenues since 2001, Defendant has implemented several measures to reduce costs, including facility closures and consolidations and significant employee layoffs. (Id. at ¶ 9.) In September of 2002, Defendant began preparing for a reduction in force. (Id. at ¶ 11.) One of the departments impacted was the department in which Plaintiff was working at the time. (Id.) Plaintiff and about fifty other employees in the R & D Department were scheduled to be laid off in October of 2002. (Id. at ¶ 12.) Prior to announcing the final layoff decisions, however, Defendant permitted the managers who supervised the employees scheduled to be laid off to explore whether positions were available elsewhere within OFS into which the employees might be transferred. (Id. at ¶ 13.)

David Kalish ("Kalish"), Chief Technology Officer and Vice President of R & D, recommended Plaintiff to Michael Pearsall ("Pearsall"), Vice President of Global Sales and Marketing and Product Management, for consideration for transfer into the Product Line Management ("PLM") Department as a Product Manager. (Id. at ¶ 14.) Peter Roberts, Defendant's Director of Product Management, interviewed Plaintiff for the Product Manager position. (Id. at ¶ 15.) During the interview, Roberts described the duties and responsibilities for that position. (Id.)

---

**1.** As used herein, "DSMF" shall refer to Defendant's Statement of Material Facts Which It Contends Are Not in Dispute.

Roberts described the position to include responsibility for the management of the life cycle of Defendant's products, which involved defining products, promoting products, positioning and distinguishing Defendant's products from those of competitors, and pricing products in the marketplace. (*Id.* at ¶ 16.) Product Managers were also required to interact and communicate effectively with Defendant's customers and the sales, marketing, and operations personnel. (*Id.*)

Roberts hired Plaintiff as a Product Manager in the PLM Department, (*id.* at ¶ 17), although Plaintiff contends he did so reluctantly (PSMF [2] ¶ 15). According to Plaintiff, Roberts learned that in order to hire her as Product Manager, Roberts had to release another OFS employee, Brian McDermontt ("McDermontt"). (*Id.* at ¶ 11.) Roberts had known McDermontt at least ten (10) years and was not in favor of releasing him because Roberts worked well with McDermontt and was satisfied with McDermontt as an employee. (*Id.* at ¶¶ 11–12.) Notwithstanding Roberts' reluctance to release McDermontt, McDermontt's position was eliminated, and Plaintiff assumed McDermontt's job functions. (*Id.* at ¶¶ 14–15.)

Plaintiff's transfer to the PLM Department prevented Plaintiff from being laid off in October of 2002. (DSMF ¶ 18.) Plaintiff worked as a Product Manager for approximately four months from October of 2002 until the termination of her employment on February 12, 2003. (*Id.* at ¶ 19.) During the time Plaintiff worked as a Product Manager, she reported to Roberts and Roberts reported to Pearsall, who traveled frequently internationally and domestically. (*Id.* at ¶ 20; PSMF ¶ 4.) Plaintiff was assigned to manage Defendant's

"ocean" and "nonzero dispersion fiber" ("NZDF") products. (DSMF at ¶ 21.)

### C. *Boex's Performance as a Product Manager*

Defendant contends Plaintiff's performance as a Product Manager was unsatisfactory. (*Id.* at ¶ 22.) Specifically, Defendant claims both Pearsall and Roberts believed Plaintiff failed to do the following: (1) effectively manage Defendant's relationship with Tyco, which was Defendant's only customer for the ocean product; (2) effectively communicate with members of Defendant's sales team; (3) secure the confidence of Defendant's management staff; (4) satisfactorily prepare and present a product plan for the NZDF product at the global sales meeting that occurred in January of 2003; and (5) ensure the timely delivery of a product to a new customer in February of 2003. (*Id.*) With the exception of post-termination documentation reflecting the reasons for Plaintiff's termination, Defendant has produced no documentation concerning any of the above performance deficiencies.

Plaintiff refutes she performed unsatisfactorily as a Product Manager. Plaintiff states Pearsall never criticized her work on the NZDF plan. (PSMF at ¶ 29(i).) Rather, she states she had a discussion with Pearsall concerning a product Roberts wanted Plaintiff to include in the plan, although the product did not exist at that time. (*Id.*) As to Plaintiff's management of the relationship with Tyco, Plaintiff states Pearsall only heard from Kalish that Plaintiff failed to return a telephone call from the contact at Tyco, and Plaintiff contends this evidence is inadmissible. (*Id.* at ¶ 29(iii).) Plaintiff also states Tyco

**2.** As used herein, "PSMF" shall refer to Plaintiff's Statement of Material Facts As To Which She Contends Are Disputed.

highly valued her. (*Id.*) Moreover, regarding her product presentation in 2003, Plaintiff states there is no documentation that the presentation was deficient. (*Id.* at ¶ 29(ii).) Finally, with respect to her alleged failure to deliver a product to a new customer in a timely manner, Plaintiff argues that Roberts ordered the wrong fiber for the customer. (*Id.* at ¶ 30.)

### D. *Alleged Discriminatory Remarks by Boex's Supervisor*

Plaintiff claims Roberts repeatedly made stereotypic, racist comments in her presence about her Russian and Jewish ancestry, as well as other offensive comments about Russians and Jews in particular. (*Id.* at ¶ 16.) Roberts admits stating to Plaintiff, "You don't look Russian, you look Romanian," or something to that effect. (*Id.;* Roberts Dep. at 97–98.) According to Plaintiff, Roberts made this statement completely out of the blue at some point in November of 2002. (PSMF ¶ 18.) Plaintiff also maintains that in a meeting concerning a customer, Roberts stated in her presence that Defendant could not get rid of the customer because of the "Kalish–Shapiro relationship." (*Id.* at ¶ 17.) Plaintiff likewise recalls Roberts might have made a statement that Plaintiff would connect with a customer because Plaintiff was Jewish. (*Id.*) Roberts also allegedly stated, "Those Jewish men think they run the business but, in fact, it's us Germans running the business." (*Id.*) Plaintiff reported this statement to Kalish but did not ask him to take any action against Roberts or to do anything about the comment. (DSMF ¶ 39.) Plaintiff remembers Roberts asking her on one occasion why all Russian people have bad teeth and then commenting that it seemed like she had good teeth. (PSMF ¶ 19.) Plaintiff further contends Roberts made several comments to the effect she was doing things the way they were done in Russia, and Roberts allegedly made these comments in the context of Plaintiff's job performance. (PSMF ¶¶ 20–21; Pl. Dep. at 209.) Finally, Plaintiff contends Roberts repeatedly reminded her that he was German. (PSMF ¶ 22.)

### E. *Boex's Termination and Complaint to the EEOC*

On February 12, 2003, Roberts informed Plaintiff that her at-will employment as a Product Manager was being terminated, (DSMF ¶¶ 25, 38), but the parties dispute whether Roberts or Pearsall made the termination decision.[3] During the meeting, Roberts and Rick Durham ("Durham"), Defendant's Performance Management Manager, presented Plaintiff with job descriptions for three open positions with OFS and asked whether Plaintiff wished to be considered for any of the jobs. (*Id.* at ¶ 26.) After reviewing the job descriptions, Plaintiff informed Roberts and Durham that she did not wish to be considered for any of the three positions. (*Id.*) According to Plaintiff, each of the positions offered was a clerical position, which Plaintiff thought was incompatible with her education. (Pl. Dep. at 168.)

On February 14, 2003, Plaintiff met with Durham and Clem Johnson ("Johnson"), who was at that time Defendant's Director

---

**3.** In this regard, Pearsall states he instructed Roberts to terminate Plaintiff based on her failure to ensure timely delivery of the OFS product and his prior observations of Plaintiff's inability to perform the duties of a Product Manager effectively. (Pearsall Decl. ¶ 15.) Pearsall further states he alone made the decision to terminate Plaintiff and did not ask for or receive a recommendation from Roberts. (*Id.* at ¶ 16.) Plaintiff wholly refutes Pearsall would have made this decision and argues that the Court should discredit Pearsall's testimony.

of Human Resources, to discuss her termination status. (Johnson Decl. ¶¶ 3, 10; Pl. Dep. at 164.) Plaintiff's notes from the meeting, which she e-mailed Johnson, reflect, among other things, that she was terminated as a result of alleged poor job performance. (Pl.Dep., Ex. 23.) Her notes likewise reflect that Johnson informed her Roberts had failed to follow appropriate corporate procedures for terminating her. (*Id.*) Johnson advised Plaintiff he would look into the matter and meet with her the next week. (PSMF ¶ 31; Johnson Decl. ¶ 10.)

On February 19, 2003, Plaintiff again met with Durham and Johnson. (DSMF ¶ 27.) At that meeting, Johnson informed Plaintiff that Defendant would consider her termination to be that of a layoff and would offer her a severance package. (*Id.* at ¶ 28.) After Johnson reaffirmed Defendant's reason for her termination and explained her severance opportunity, Plaintiff informed Johnson she believed her discharge was the result of discrimination by Roberts and told Johnson of several inappropriate comments, which Plaintiff attributed to Roberts. (*Id.* at ¶ 29.)

Following his meeting with Plaintiff on February 19, 2003, Johnson met with Roberts to discuss the inappropriate comments alleged by Plaintiff. (*Id.* at ¶ 30.) In that meeting, Roberts denied making any inappropriate comments but stated he may have used the word "German," although the statement was not directed at Plaintiff or anyone else in the office. (*Id.*) Although Johnson could not confirm with anyone else that Roberts had made any of the inappropriate comments alleged by Plaintiff, Johnson counseled Roberts and reaffirmed to him Defendant's workplace harassment and EEO policies.[4] (*Id.* at ¶ 32.)

On February 27, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging she had been discharged from OFS on account of her national origin and religion in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (*Id.* at ¶ 33.) On March 20, 2003, following an investigation into Plaintiff's charge, the EEOC issued a determination finding "no evidence to indicate that [she had been] discriminated against." (*Id.* at ¶ 34.) The instant lawsuit followed.

## II. STANDARD FOR SUMMARY JUDGMENT

▉ Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 750 (11th Cir.2000). The substantive law applicable to the case determines the materiality of facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, a dispute is genuine if the evidence is such that the factual issues "may reasonably be resolved

---

4. Defendant's Standards of Conduct provides, in pertinent part, the following:

OFS is committed to providing a work environment free from discrimination based on race, color, religion, national origin, sex, age, disability, sexual preference or orientation, marital status, or any unlawful factor. This means that we comply with applicable human rights and employment equity legislation and we don't discriminate unlawfully in any aspect of employment, including recruiting, hiring, compensation, promotion or termination. It also means that OFS does not permit conduct that creates an intimidating or offensive work environment. (Pl.'s Dep., Ex. 10.)

in favor of either party." *Id.* at 250, 106 S.Ct. 2505. However, an issue of fact is not genuine if it is not supported by evidence or if it is created by evidence that is "merely colorable" or "not significantly probative." *Dickson v. Amoco Performance Prods.,* 845 F.Supp. 1565, 1568 (N.D.Ga.1994) (citing *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505).

The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc). When the nonmoving party has the burden of proof at trial, the moving party may discharge its initial burden by " 'showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party fails to discharge its initial burden, then the court must deny the motion. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). If, however, the moving party meets the burden, the nonmoving party must then "go beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). If, in response, the non-moving party fails to support an essential element of her case as to which she bears the burden of proof, summary judgment is appropriate. *Rice–Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

In deciding a summary judgment motion, the court must view the evidence in a light most favorable to the nonmoving party. *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). If reasonable minds could differ as to the import of the evidence, and a reasonable interpretation of the evidence could lead to a verdict in favor of the nonmoving party, then summary judgment is inappropriate. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. On the other hand, when the evidence in the record could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. *Claim Under 42 U.S.C. § 1981*

Plaintiff first alleges Defendant terminated her on the basis of her race and ancestry in violation of 42 U.S.C. § 1981. In pertinent part, Section 1981 provides the following:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, liens, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Courts employ the same analytical framework in evaluating claims

brought under Section 1981 as they do in evaluating claims brought under Title VII. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998). Absent direct evidence of discrimination,[5] a plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 504, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In a case alleging discriminatory discharge or termination, this may be accomplished by showing the following: (1) she is a member of a protected class; (2) she was qualified for the position from which she was terminated; (3) she was terminated; and (4) she was replaced by someone who was not a member of her protected class or a similarly situated employee who was not a member of her protected class engaged in comparable conduct and was not discharged.[6] *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1294 (11th Cir.2002); *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir.1995). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

 Once a plaintiff sets out a *prima facie* case of discrimination, a legal presumption of discrimination arises and a burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d

1057, 1061 (11th Cir.1994). The Eleventh Circuit has clarified that this burden is "exceedingly light." *Id.* (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994)). If the defendant meets this burden, the presumption of discrimination is eliminated and the burden of production then shifts to the plaintiff to offer evidence that the reason proffered by the defendant is a pretext for illegal discrimination. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir.1999). At all times, " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1455 (11th Cir.1996) (citation omitted); *see also Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir.1997).

### 1. Plaintiff's *Prima Facie* Case

In accordance with the *McDonnell Douglas* burden-shifting framework set forth above, the Court first addresses whether Plaintiff can establish a *prima facie* case of discrimination with respect to the termination of her employment from OFS. For purposes of this Motion for Summary Judgment, Defendant does not dispute that Plaintiff is a member of a protected class or that Defendant terminated her employment.[7] The parties disagree, however, as to whether Plaintiff can establish she was qualified for the position from which she was terminated and whether she can establish that she was replaced by someone who was not a member of her

---

**5.** Plaintiff does not maintain there is direct evidence of discrimination in this case.

**6.** Both Defendant and Plaintiff agree this is the proper standard to employ in this case.

**7.** As a person of Russian–Jewish ancestry, Plaintiff is a member of a protected class.

See *St. Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Donaire v. NME Hosp.; Inc.*, 27 F.3d 507, 509 (11th Cir.1994). Further, the evidence in the record demonstrates Plaintiff was terminated.

protected class or that a similarly situated employee who was not a member of her protected class engaged in comparable conduct and was not discharged.

#### (a) Qualification for the Position

■ Defendant contends Plaintiff's deficient performance as a Product Manager precludes her from being able to establish that she met the qualifications for the job. Plaintiff's alleged deficient performance, however, is also Defendant's legitimate, non-discriminatory reason for terminating Plaintiff. According to Plaintiff, this makes the question of Plaintiff's qualification for the position of Product Manager inseparable from the question of whether Defendant's asserted legitimate, non-discriminatory reason is pretextual for discrimination.

According to the Eleventh Circuit and several other circuit courts, courts should be careful not to conflate the plaintiff's burden to show that she was qualified for the position with the second and third prongs of the *McDonnell Douglas* analysis. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir.1993) (stating that concerns about an employee's performance are more appropriately addressed at steps two and three of the *McDonnell Douglas* scheme); *accord EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir.2000); *Cline v. Catholic Diocese*, 206 F.3d 651, 660–61 (6th Cir.2000); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 n. 4 (7th Cir.1994); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798–99 (3d Cir.1990); *Bienkowski v. American Airlines*, 851 F.2d 1503, 1505–06 (5th Cir.1988). *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978). Therefore, instead of focusing on alleged performance problems at this stage, the Eleventh Circuit directs the Court to focus on Plaintiff's skills and background. *Clark*, 990 F.2d at 1227. Insofar as neither Plaintiff nor Defendant flesh out Plaintiff's skills and background for purposes of this first element of Plaintiff's *prima facie* case and insofar as Defendant initially had enough confidence in Plaintiff's skills and background to hire her for the position of Product Manager, the Court will assume Plaintiff has established this element of her *prima facie* case.

#### (b) Replacement or Comparator

■ Next, the Court finds that Plaintiff has not alleged, argued, or set forth any evidence that she was replaced by someone who was not a member of her protected class or that a similarly situated employee who was not a member of her protected class engaged in comparable conduct and was not discharged. In response to Defendant's Motion for Summary Judgment, Plaintiff mistakenly asserts that the only prong of the *prima facie* case analysis contested by Defendant is whether Plaintiff was qualified for the position of Product Manager. However, a review of Defendant's Memorandum of Law in Support of the Motion for Summary Judgment indicates otherwise.

Defendant specifically argues in its supporting brief that the record is devoid of evidence to establish that Plaintiff "was replaced by someone outside of her protected class or that similarly-situated employees with comparable performance problems were less severely disciplined." (Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 17.) Contending it is entitled to summary judgment on this basis, Defendant cites to *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir.2000), a case granting judgment as a matter of law to an employer after the plaintiff failed to show that she was similarly situated to an employee who received more favorable treatment from

the employer.[8] *Abel* is distinguishable from the instant case inasmuch as that case proceeded to trial and the plaintiff admitted to the conduct complained of by the employer. Here, the case is before the Court on a motion for summary judgment and Plaintiff refutes she had any performance problems while employed by Defendant. However, as Defendant argues, there is no evidence in the record to demonstrate that this fourth prong has been met, and Plaintiff has not made any argument to the contrary.

Notwithstanding the foregoing, several cases decided by courts within the Eleventh Circuit stand for the proposition that "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (citing *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir.1989)); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091–92 (11th Cir.2004); *Hudson v. Norfolk Southern Ry. Co.*, 209 F.Supp.2d 1301, 1332 (N.D.Ga.2001). In most of these cases, the plaintiffs at least made an attempt to show the existence of a similarly situated employee. *But see Wilson*, 376 F.3d 1079, 1091–92. In this case, on the other hand, Plaintiff does not even mention who replaced her as Product Manager, and she does not discuss any employees being similarly situated.

*Wilson*, the most recent Eleventh Circuit case standing for the aforementioned proposition, states the analysis must not end with a plaintiff's failure to identify a comparator. *Id.* In *Wilson*, the plaintiff brought a claim against her former employer, alleging she was terminated on the basis of her sex in violation of Title VII. The parties did not dispute plaintiff was a member of a protected class, was subjected to an adverse employment action when terminated, and was qualified for the position she previously held. However, the plaintiff did not identify a similarly situated male employee who the employer treated more favorably. Due to her failure to identify such a comparator, the district court held on summary judgment that the plaintiff had not established a *prima facie* case of discrimination. On appeal, the Eleventh Circuit ultimately agreed that the plaintiff had not been terminated on the basis of her sex and that summary judgment was properly entered against her as to the termination claim. However, the court found that the district court failed to consider in its analysis of the termination claim whether any other evidence of discrimination was present. The court reiterated the principle that " '[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate *where no other evidence of discrimination is present.*' " *Wilson*, 376 F.3d 1079, 1091–92 (emphasis in original) (citations omitted). Based on *Wilson*, the Court believes further analysis of Plaintiff's discrimination claim is required.

Plaintiff's *prima facie* case certainly is not strong, but Plaintiff need only raise an inference of discrimination at this juncture. *Holifield*, 115 F.3d at 1562. Thus, at this stage of the analysis, the Court finds that Roberts' statements concerning Russians and Jews are sufficient to raise an inference of discrimination.[9] *See Dickson*, 845

---

8. Defendant also relies on *Beck v. City of Durham*, 129 F.Supp.2d 844, 855 (M.D.N.C. 2000), a case in which a Jewish police officer's claim under § 1981 was dismissed on a 12(b)(6) motion because the plaintiff had failed to allege similarly situated employees received more favorable treatment from the employer.

9. For the purpose of ruling on this summary judgment motion, the Court gives credence to

F.Supp. at 1569–70 (holding that evidence of isolated and stray remarks about a protected characteristic are sufficient to enable a plaintiff to make out a *prima facie* case of discrimination); *Herawi v. Alabama Dep't of Forensic Sciences*, 311 F.Supp.2d 1335, 1347 (M.D.Ala.2004) (supervisor's alleged comments about plaintiff's ancestry were sufficient to create plaintiff's *prima facie* case where the plaintiff failed to identify a comparator or present evidence about her replacement). *But see Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir.1998) (holding that a supervisor's discriminatory comments were insufficient to establish a *prima facie* case of discrimination).[10]

## 2. Legitimate, Non–Discriminatory Reason

█ Having concluded that Plaintiff has put forth a *prima facie* case, the burden shifts to Defendant to provide a legitimate, non-discriminatory reason for Plaintiff's termination. An employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal citation omitted).

█ Defendant's stated reason for terminating Plaintiff is that she did not perform in an acceptable manner in the position of Product Manager. In this regard, Defendant specifically contends that during the four months Plaintiff worked in the position of Product Manager, she failed to do the following: (1) effectively manage Defendant's relationship with Tyco, which was Defendant's only customer for the ocean product; (2) effectively communicate with members of Defendant's sales team; (3) secure the confidence of Defendant's management staff; (4) satisfactorily prepare and present a product plan for the NZDF product at the global sales meeting that occurred in January of 2003; and (5) ensure the timely delivery of a product to a new customer in February of 2003. (Roberts Dep. at 64–65, 69, 71, 76; Pearsall Dep. at 67, 69–70, 72, 74; Pearsall Decl. ¶¶ 10–11, 13–15.) Both Pearsall and Roberts have elaborated on these purported performance deficiencies by way of deposition and/or affidavit testimony. Notably, Plaintiff does not refute with any evidentiary support that she was not able to communicate effectively with members of Defendant's sales team or secure the confidence of Defendant's management staff.[11] Therefore, the

Plaintiff's allegation that Roberts made these statements.

**10.** In *Herawi*, there was unrebutted evidence that the supervisor who made the remarks had direct input into the decision to terminate the former employee who brought the lawsuit. In *Jones*, however, there was no dispute that the ultimate decision to terminate the plaintiff was made by a personnel committee, not by the supervisor who made the comments. This case falls somewhere in between *Herawi* and *Jones* because there is a dispute about who made the termination decision in this case. Plaintiff contends Roberts made the decision, and Defendant has presented affida-

vit and deposition testimony to support its contention that Pearsall made the decision to terminate Plaintiff. While the Court makes no decision at this juncture as to whether there is a *genuine* dispute of material fact as to who made the termination decision, the Court will proceed with the *McDonnell Douglas* analysis since making out a *prima facie* case is not intended to be an onerous task.

**11.** In Plaintiff's Statement of Material Facts as to Which She Contends are Disputed, Plaintiff relies on the deposition testimony of Kalish to assert that she "never had any difficulty communicating with anyone while she was either in the R & D Department or when

Court finds Defendant has met its "exceedingly light burden" of articulating a legitimate, non-discriminatory reason for Plaintiff's termination.

### 3. Pretext

■ Given that Defendant has proffered a legitimate, non-discriminatory reason for its decision to terminate Plaintiff, Plaintiff now has the burden to show that Defendant's reason is merely pretextual for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. A plaintiff may demonstrate pretext (1) by showing that the legitimate, non-discriminatory reason offered by the employer should not be believed or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Standard*, 161 F.3d at 1332; *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir.1996). With respect to the first method of demonstrating pretext, the court must "evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir.1997) (citing *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (en banc)). "At summary judgment, plaintiff's burden is simply to raise a genuine factual question as to the existence of pretext."

*Mulhall v. Advance Sec.*, 19 F.3d 586, 598 (11th Cir.1994).

Plaintiff essentially makes three arguments in an attempt to demonstrate pretext. As an initial matter, Plaintiff contends Defendant is not telling the truth about the actual identity of the decision-maker. Second, Plaintiff argues Defendant's proffered reason is not credible because, among other things, there is no documentary support that her performance was deficient. Finally, Plaintiff contends that unlawful discrimination was actually the motivating factor for the decision to terminate her.

### (a) Identity of Decision-maker

■ Plaintiff and Defendant dispute whether Pearsall or Roberts made the decision to terminate Plaintiff. Pearsall and Roberts have testified under oath that Pearsall solely made the decision to terminate Plaintiff and Pearsall then instructed Roberts to facilitate the termination.[12] Plaintiff nevertheless maintains that Roberts was the decision-maker. Plaintiff argues the Court cannot give credence to Pearsall's testimony for several reasons. First, Plaintiff maintains she reported directly to Roberts, who allegedly was opposed to hiring Plaintiff in the first place, and Pearsall testified that Roberts never communicated any problems to him regarding Plaintiff's performance. Second, Plaintiff points out that Roberts documented the reasons for Plaintiff's termination, not Pearsall. Third, Plaintiff implies that because Pearsall did not regularly super-

---

she was employed in the PLM department." (PSMF ¶ 9.) However, this statement misrepresents Kalish's testimony. Kalish addressed only whether Plaintiff communicated well with her co-workers while in the R & D Department. (Kalish Dep. at 26.)

**12.** In response to Defendants Statement of Material Facts, Plaintiff asserts Pearsall admitted he was not the decision-maker, but

there is no evidence in the record to support this assertion and Plaintiff does not cite to any such evidence. Further, Plaintiff denies Pearsall played any material role in her termination, but Plaintiff's mere denial is insufficient to create a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

vise Plaintiff and was often traveling domestically and internationally, Pearsall did not have independent information concerning Plaintiff's performance on which he could base a termination decision. Finally, Plaintiff claims Pearsall's testimony about her performance deficiencies is not credible.[13]

The Court will address Plaintiff's first and third arguments simultaneously. Both parties agree Plaintiff reported directly to Roberts and Roberts reported to Pearsall. Further, it also is not in dispute that Pearsall traveled frequently. Nevertheless, the uncontested evidence shows that Pearsall interacted with Plaintiff, accessed her written work product, spoke with other individuals within the company regarding Plaintiff's performance as a Product Manager, and was present when Plaintiff delivered her presentation to Defendant's sales team a month before her termination. Therefore, to the extent Plaintiff contends Pearsall was not in a position to judge her performance and/or to make the decision to terminate her without input from Roberts, the evidence does not support this contention.

Additionally, as to Plaintiff's assertion that Roberts was opposed to bringing her into the PLM Department, the record indicates Roberts ultimately was supportive of hiring Plaintiff to be Product Manager. Even if Roberts were not, however, Plaintiff has not explained how this fact would rebut Pearsall's testimony that he made the decision to terminate her. Plaintiff apparently contends Roberts never wanted her in the PLM Department because he did not want to get rid of McDermontt,

another employee with whom Roberts had been working for years. While the record shows Roberts was reluctant to release McDermontt because he thought McDermontt was a good employee, Plaintiff misrepresents that "Roberts specifically told Pearsall that he (Roberts) was opposed to hiring Boex and firing McDermontt." (PSMF ¶ 13.) Rather, Roberts' deposition testimony reflects he did not want to release McDermontt if other options were available, but Roberts was willing to take a risk on Plaintiff. (Roberts Dep. at 56.) Further, Roberts testified that he "agreed with Mr. Pearsall that if [he] could improve the technical skills in the group, [he] could work with Bella to take on some of the commercial responsibility." (*Id.* at 56–57). While the Court draws all reasonable inferences in Plaintiff's favor for purposes of this summary judgment motion, a fair reading of Roberts' deposition testimony shows he did not oppose hiring Plaintiff. To the extent the evidence shows Roberts initially opposed Boex coming into the PLM Department due to Roberts' reluctance to release McDermontt, that does not demonstrate discriminatory animus or otherwise discredit Pearsall's testimony that he made the decision to terminate Plaintiff.

Plaintiff next argues the Court must discredit Pearsall's testimony that he made the decision to terminate her because Roberts was the person who documented the reasons for her termination. In this regard, Pearsall testified that Roberts documented the reasons for terminating Plaintiff because he was her direct supervisor

---

13. In addressing Plaintiff's arguments regarding the identity of the decision-maker, the Court is mindful that factfinding is a task within the sole province of the jury. However, at the summary judgment stage, the Court does have an obligation to examine the record to determine whether Plaintiff has come forth with evidence that raises a genuine issue of material fact as to pretext. *See Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir.2002) ("Judges are responsible for drawing the lines on what evidence is sufficient to create an issue on pretext.").

and that was a part of his job responsibilities. (Pearsall Dep. at 66.) Pearsall told Roberts the reasons why he had decided to terminate Plaintiff, and he testified that Roberts had observed the same things and more. (*Id.* at 66–67). Insofar as the Court is not in a position to judge whether Roberts was the appropriate person to document the reasons for Plaintiff's termination and Plaintiff has not presented any evidence that this was an atypical manner to allocate responsibilities, the Court finds this to be an unpersuasive reason to discredit Pearsall's testimony.

As to Plaintiff's final contention that Pearsall's testimony regarding her performance is not credible, the Court addresses this argument in conjunction with its analysis of whether Defendant's legitimate, non-discriminatory reason is credible. The Court's findings with respect to both issues follow below.

(b) Credibility of the Legitimate, Non–Discriminatory Reason

██ The Court first examines the evidence concerning Plaintiff's five alleged performance deficiencies: (1) her inability to effectively manage Defendant's relationship with Tyco (2) her inability to communicate effectively with members of Defendant's sales team; (3) her inability to secure the confidence of Defendant's management staff; (4) her inability to satisfactorily prepare and present a product plan for the NZDF product at the global sales meeting that occurred in January of 2003; and (5) her inability to ensure the timely delivery of a product to a new customer in February of 2003. The Court need not address Plaintiff's inability to communicate effectively with members of Defendant's sales team or her inability to secure the confidence of Defendant's management staff because Plaintiff has not contested these allegations and Defendant

has supported the allegations with evidence from the record.

As to Defendant's contention that Plaintiff mismanaged the relationship with Tyco, Plaintiff fails to rebut this contention with evidence in the record. Pearsall attested in his affidavit that he learned from Kalish that Plaintiff had failed to return phone calls to Defendant's contact at Tyco, Seymour Shapiro. (Pearsall Decl. ¶ 4; Pearsall Dep. at 72.) The record indicates Tyco was the only customer that Defendant had for the ocean product, and this product was Plaintiff's responsibility. (*Id.*; Pl. Dep. at 108.) Plaintiff does not admit or refute that she failed to return phone calls to Seymour. Rather, without any citation to evidence in the record, she states that "the evidence of record indicates that TYCO highly valued [her]." This conclusory assertion does not allow Plaintiff to defeat summary judgment. *See Holifield,* 115 F.3d at 1564 n. 3 (conclusory assertions, without support in the record, are insufficient to withstand summary judgment); *Ratliff v. DeKalb County,* 62 F.3d 338, 341 (11th Cir.1995) (a plaintiff seeking to avoid summary judgment "must present specific nonconclusory facts that would support a jury verdict against the particular defendant on discriminatory intent"); *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990) ("the plaintiff must ... present concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice.")

Plaintiff also makes the unavailing argument that Defendant's evidence with respect to the Tyco issue is not admissible because Defendant relies on double-hearsay regarding whether Plaintiff returned Mr. Shapiro's calls. However, Defendant takes the position that an exception to the hearsay rule would apply in this instance

because Defendant would be introducing this information not for the truth of the matter asserted but rather as evidence of Pearsall's intent when he made the termination decision. Assuming *arguendo* Pearsall made the decision, the Court believes that statements made to Pearsall about Plaintiff's alleged failure to return phone calls would be admissible for the limited purpose of explaining Pearsall's intent or state of mind when he made the decision to terminate Plaintiff. *See* Fed. R.Evid. 803. Moreover, the Court notes that the statements need not be true so long as Pearsall believed they were true. *See Abel,* 210 F.3d at 1339 n. 5 (stating that an employer may terminate an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason").

With respect to Pearsall's alleged dissatisfaction with Plaintiff's preparation of the product plan, there is disputed testimony in the record. Pearsall testified he discussed the product plan with Plaintiff in December of 2002 or January of 2003, and informed her there were deficiencies in the plan, which she needed to fix. (Pearsall Decl. ¶ 11; Pearsall Dep. at 68.) To the contrary, Plaintiff attests she had a "discussion" with Pearsall about a product that Roberts wanted her to include in the plan, which was not yet in existence. (Pl. Decl.¶ 5.)[14] Plaintiff acknowledges giving Pearsall a draft of the product plan for his review, but she states she never received any feedback from Pearsall, positive or negative.[15] (*Id.* at 5–6.) Here, Plaintiff presents a legitimate factual dispute, but this does not constitute a material dispute precluding summary judgment because Defendant has otherwise sufficiently shown that it believed Plaintiff's performance was deficient.

With respect to Pearsall's criticism of Plaintiff's presentation of the product plan at the global sales meeting in January of 2003, Pearsall testified he observed Plaintiff's presentation at the meeting and later made comments to Plaintiff concerning problems with the presentation. (Pearsall Dep. at 69.) Specifically, Pearsall stated he talked to Plaintiff about a new product in her line, True Wave Reach. (*Id.* at 69–70.) Apparently, Pearsall was critical of Plaintiff's alleged comment at the sales meeting that the product was not much different than the old product in her line. (*Id.* at 70.) In response, Plaintiff states Defendant did not sell True Wave Reach during 2002 or 2003, but Plaintiff again fails to support this assertion with any evidence in the record. In addition, Plaintiff notably does not refute that Pearsall was at the sales meeting or that he counseled her following the sales meeting about her presentation. The unrebutted evidence indicates that both Pearsall and Roberts were dissatisfied with Plaintiff's

**14.** While Defendant has not objected to the Court's consideration of Plaintiff's Declaration, the Court notes that Plaintiff's Declaration was executed and filed with the Court a month after Plaintiff filed her papers in opposition to Defendant's Motion for Summary Judgment. Given that Plaintiff's Memorandum in [sic] Law in Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Statement of Material Facts As To Which She Contends Are Disputed both rely on Plaintiff's Declaration, which was not yet in existence at the time these documents were filed, the Court is not even obligated to consider Plaintiff's Declaration. In the exercise of its discretion, however, the Court will consider the declaration.

**15.** The Court observes that Plaintiff admits Roberts had problems with the plan. According to Plaintiff's deposition testimony, Roberts had to rewrite the plan after Plaintiff submitted it to him. (Pl. Dep. at 141.) Plaintiff makes no admission, however, that Pearsall had problems with the plan.

presentation at the sales meeting. (Pearsall Decl. ¶ 11; Pearsall Dep. at 69–70; Roberts Dep. at 74.)

Defendant contends that its breaking point with Plaintiff was her failure to deliver timely a product to a customer in February of 2003. (Pearsall Decl. ¶¶ 13–15.) Plaintiff asserts Pearsall's deposition testimony regarding this issue is inaccurate and inconsistent with the testimony of Roberts. In this regard, Plaintiff states that whereas Pearsall's criticism concerned the timeliness of the delivery, Roberts' criticism concerned whether the correct product was shipped to the customer. However, the record indicates that the wrong product was shipped initially, (Pl. Decl. ¶ 12; Roberts Dep. at 79), and Defendant's primary concern then became to make sure that the correct product made it to the customer in a timely manner (Roberts Dep. at 79.) Thus, the testimony given by Pearsall and Roberts is not in conflict.

The record shows Defendant had reason to believe Plaintiff's performance was less than stellar, but the Court still will address Plaintiff's argument that Defendant did not document the deficiencies or otherwise counsel her. Based on the Court's review of the record, Plaintiff appears to be correct that Defendant did not document her poor performance prior to her termination. Nevertheless, Plaintiff has not established or even argued that Defendant had a policy of documenting performance deficiencies or that Defendant applied this policy in a discriminatory manner.

*See Rojas,* 285 F.3d at 1344 n. 4 ("To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner.") In addition, Defendant has set forth evidence demonstrating Plaintiff had oral or informal notice of her performance deficiencies,[16] and Plaintiff has not rebutted this evidence or offered any affirmative evidence that Defendant was pleased or satisfied with her performance.

Finally, Plaintiff states that Johnson, the Director of Human Resources at the time of Plaintiff's termination, informed her that Roberts violated company procedure in terminating her. According to Plaintiff, this establishes a genuine issue of fact as to whether her performance was the true reason for her termination. The evidence on which Plaintiff apparently relies is an e-mail she sent Johnson recapping the main points of one of the meetings she had with Johnson. Pretermitting whether this e-mail would be admissible as evidence of what Johnson said at the meeting, Plaintiff recalls Johnson stating that Roberts failed to follow appropriate corporate procedures for terminating her, not that the decision to terminate was itself improper. Assuming *arguendo* Roberts did not follow the appropriate procedure in the manner in which he terminated Plaintiff, that does not raise a genuine issue of material fact regarding the reason for Plaintiff's termination. Thus, the Court is not persuaded that this is evidence of pretext.

Based on the foregoing, the Court finds Plaintiff has failed to demonstrate that

---

**16.** As mentioned *supra,* Plaintiff has not refuted Pearsall's testimony that he counseled her about her presentation at the sales meeting. Additionally, Plaintiff admitted in her deposition that Roberts, on at least one occasion, told her that she was being too technical in her communication with salespeople and customers. (Pl. Dep. at 132.) In this regard, Plaintiff testified about one specific situation in which Roberts advised her that she was confusing the salesperson. (*Id.* at 135, Ex. 13.) She also stated that Roberts mentioned something like that probably more than once. (*Id.* at 136.) Thus, to the extent Plaintiff takes the position that she was never counseled, the record reflects that such a position would be disingenuous.

Defendant's legitimate, non-discriminatory reason should not be believed. Even if Plaintiff is correct that Pearsall never counseled her about her performance plan, which is the only alleged performance deficiency as to which there is a legitimate dispute, Defendant has presented several other performance deficiencies supporting the basis for its decision to terminate Plaintiff. Moreover, revisiting the issue of whether the Court should credit Pearsall's testimony that he made the decision to terminate Plaintiff, the Court finds that Plaintiff has presented only "colorable" evidence that Pearsall was not the decisionmaker. Plaintiff's conclusory assertions that Roberts made the decision are not sufficient to create a genuine issue of material fact to defeat summary judgment. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Earley,* 907 F.2d at 1081.

(c) Discriminatory Remarks by Roberts

■ Plaintiff's final argument as to pretext is that there is substantial evidence that Roberts made stereotypic, racist remarks in the context of her job or job performance. The comments at issue include the following: (1) Roberts' statement to Plaintiff that she looked more like a Romanian than a Russian; (2) Roberts' inquiry to Plaintiff regarding why Russians had bad teeth and his subsequent comment to her that it looked like she had good teeth; (3) Roberts' statements to Plaintiff that she must be doing things the way they were done in Russia; (4) Roberts' statement that OFS could not get rid of Tyco as a customer because of the "Kalish–Shapiro relationship"; (5) Roberts' statement to Plaintiff that perhaps she could connect well with a customer because she was Jewish (6) Roberts' statement that "[t]hose Jewish men think they run the business but, in fact, it's us Germans running the business"; and (7) Rob-

erts' repeated reminders to Plaintiff of his German ancestry.

■ As an initial matter, the Court acknowledges that discriminatory comments may be sufficient to constitute circumstantial evidence of discrimination, even if they could not establish direct evidence of discrimination. *See Ross v. Rhodes Furniture,* 146 F.3d 1286, 1291 (11th Cir.1998) (discriminatory comments not directly related to termination decision were sufficient evidence of pretext where supervisor who terminated plaintiff had engaged in the same activity for which plaintiff was terminated). In examining the probative value of the comments, the court considers the substance, context, and timing of the comments. *Damon v. Fleming Supermarkets, Inc.,* 196 F.3d 1354, 1362 (11th Cir.1999); *Ross,* 146 F.3d at 1291.

■ In this case, Plaintiff's failure to come forth with more than "merely colorable" evidence to rebut Defendant's evidence that Pearsall was the sole decisionmaker substantially weakens her argument that the decision to terminate her was more likely motivated by discriminatory animus than Plaintiff's proffered legitimate, non-discriminatory reason. *See Norrell v. Waste Away Group, Inc.,* 246 F.Supp.2d 1213, 1225 (M.D.Ala.2003) (plaintiff who failed to refute employer's evidence that her supervisor was not person responsible for employment decision could not establish pretext based on supervisor's alleged discriminatory comments). The Eleventh Circuit has noted that " 'statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process' at issue will not satisfy the employee's burden." *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1079 (11th Cir.2003) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., con-

curring)); *see also Holifield*, 115 F.3d at 1564; *Curtis v. Teletech Customer Care Mgmt. (Telecomms,), Inc.*, 208 F.Supp.2d 1231, 1243 (N.D.Ala.2002).

Here, the record is completely devoid of any evidence suggesting that Pearsall held a racial bias or that he made any discriminatory comments regarding Plaintiff's Russian–Jewish ancestry. Rather, the only comments at issue were made by Roberts. Significantly, there is no evidence in the record that Pearsall was aware of the comments made by Roberts when Pearsall made the decision to terminate Plaintiff, and Defendant has set forth evidence specifically indicating that Pearsall was not aware of the comments. (Pearsall Decl. ¶ 17.)

Moreover, most of the statements attributed to Roberts either were not directed at Plaintiff or were not directed at her job, job performance, or termination. *See Scott v. Suncoast Bev. Sales, Ltd.*, 295 F.3d 1223, 1229 (11th Cir.2002) (alleged discriminatory remark did not create genuine issue of material fact on issue of pretext where the remark was not related to termination and there was no additional persuasive evidence of pretext); *Rojas*, 285 F.3d at 1344 (same); *Norrell*, 246 F.Supp.2d at 1226 (same). Specifically, the comment regarding Defendant not being able to get rid of Tyco as a customer because of the "Kalish–Shapiro relationship" and the comment regarding Jewish men thinking they run the business when Germans really do were not directed at Plaintiff and did not relate to her job performance, albeit she might have found the comments offensive. Additionally, the comment that Plaintiff looks Romanian rather than Russian and the comment implying that she seems to have to good teeth while other Russians have bad teeth both reflect certain stereotypes that Roberts might hold, but they had no relation-ship to Plaintiff's job, job performance, or termination. The same is true with respect to Roberts' repeated reminders of his German ancestry.

Plaintiff disingenuously states in her brief in opposition to Defendant's Motion for Summary Judgment that "[a]ll of the stereotypic, racist comments made by Roberts were made in the context of [her] job or job performance," (Plaintiff's Memorandum in [sic] Law in Opposition to Defendant's Motion for Summary Judgment at 7). In contrast, Plaintiff's own declaration and deposition testimony reflect that only some of the comments related to her job or job performance. (Pl. Decl. ¶ 4; Pl. Dep. at 209.) Plaintiff testified during her deposition that the comments made in the context of her job performance related to Roberts saying that she was doing things the way they were done in Russia. (Pl. Dep. at 209.) Plaintiff, however, did not give any specific examples of when Roberts would make such comments. Moreover, with respect to the comment that Plaintiff might connect well with a customer because she was Jewish, Plaintiff recalls this only as a statement that she felt Roberts might have made. (*Id.* at 213.)

As to the issue of timing, the Court observes that Plaintiff was in the position of Product Manager for only four months. This case is distinguishable from many other discrimination cases because of the short time frame that Plaintiff worked in this position. Therefore, any remarks made by Roberts would have been relatively close to the time of Plaintiff's termination.

Still, when considered in conjunction with the entire record, the statements presumably made by Roberts are not significantly probative to establish that discriminatory reasons more likely motivated the decision to terminate Plaintiff or that discriminatory animus was the real reason for

the termination. *Standard*, 161 F.3d at 1332. This is particularly so given the lack of other evidence of pretext. Pearsall, the decision-maker, had no knowledge of the alleged discriminatory statements made by Roberts and had personally observed Plaintiff's deficient performance before he made the decision to terminate her. Any discriminatory bias held by Roberts is not probative, and the causal connection between Roberts' discriminatory remarks and the employment decision is weak at best. *See Holifield*, 115 F.3d at 1563–64 ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.") (citations omitted).

### 4. Conclusion as to Claim Under 42 U.S.C. § 1981

For all of the above-mentioned reasons, Plaintiff has not shown that there is a genuine issue for trial as to her claim under 42 U.S.C. § 1981. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. Rather, the Court is of the opinion that Plaintiff simply questions the wisdom or accuracy of Defendant's conclusion that she was not able to perform in the position of Product Manager effectively. *See Rojas*, 285 F.3d 1339, 1342 (noting that courts must be careful not to allow a plaintiff to litigate whether he or she was a good employee and whether the employer reached the correct conclusion that the plaintiff's performance was unsatisfactory). As the Eleventh Circuit has noted on several occasions, "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *See, e.g., Elrod*, 939 F.2d at 1470; *see also Nix*

*v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Therefore, even assuming Plaintiff could establish a *prima facie* case of discrimination before a jury, Plaintiff has failed to come forth with probative evidence from which a reasonable jury could conclude that Defendant's legitimate, non-discriminatory reason is pretextual.

### B. State Law Claims

Plaintiff's Complaint includes claims under state law for intentional infliction of emotional distress and negligent retention, but Plaintiff wholly fails to address either of these claims in opposition to Defendant's Motion for Summary Judgment. As a result, the Court deems these claims abandoned. *See, e.g., Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir.2001) (finding claim abandoned where plaintiff did not address claim until the filing of a supplemental reply brief); *Wu v. Southeast–Atlantic Bev. Corp.*, 321 F.Supp.2d 1317, 1333 (N.D.Ga.2004) (deeming claim abandoned where plaintiff failed to address claim in response to a motion for summary judgment).

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. No. 15–1].